**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| **PERDUE FARMS INC.**, <br> 31149 Ocean City Road <br> Salisbury, Maryland 21804 <br><br>       Plaintiff, <br><br> v. <br><br> **JULIE SU**, in her official capacity as Acting Secretary of the United States Department of Labor, <br><br> **PAMELA KULTGEN**, in her official capacity as an Administrative Law Judge of the United States Department of Labor, <br><br> **UNITED STATES DEPARTMENT OF LABOR**, <br><br> **THE OFFICE OF ADMINISTRATIVE LAW JUDGES OF THE UNITED STATES DEPARTMENT OF LABOR**, <br><br> *and* <br><br> **CRAIG WATTS**, <br><br>       Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Perdue Farms Inc. ("Perdue"), by its undersigned attorneys, alleges and states as follows:

## INTRODUCTION

1.     Perdue brings this action for declaratory relief under 28 U.S.C. §§ 2201-02, to enjoin Defendants from conducting unconstitutional administrative proceedings against Perdue currently pending in the U.S. Department of Labor ("DOL")'s Office of Administrative Law

Judges ("OALJ"), *Watts v. Perdue Farms Inc.*, Dkt, No. 2016-FDA-0003 (the "Administrative Proceedings"). These proceedings are unconstitutional for multiple reasons, including, *inter alia*, deprivation of Perdue's constitutional right to a jury trial guaranteed by the Seventh Amendment as recently affirmed by the Supreme Court in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) ("*Jarkesy II*").

2.      The Administrative Proceedings involve claims against Perdue for compensatory damages and other relief under the employee-protection (whistleblower) provisions of the Food Safety Modernization Act, 21 U.S.C. § 399d ("FSMA") currently pending before DOL Administrative Law Judge ("ALJ") Pamela Kultgen. An evidentiary hearing on the merits is scheduled to commence on April 14, 2025 to be tried by ALJ Kultgen without a jury and without the discovery and evidentiary protections available in an Article III court, subject to review by an appellate board and potential further determination by Acting Secretary of Labor Julie Su. The purpose of this action is to prevent DOL, its OALJ, Secretary Su, and ALJ Kultgen from continuing this unconstitutional proceeding against Perdue.

3.      The underlying facts concern a dispute between Perdue and one of its independent contractors, Craig Watts, who owns and operates C&A Farms in Fairmont, North Carolina. Watts raised chickens for Perdue as an independent contractor under a written contract between the parties. On February 23, 2015, Watts filed a complaint against Perdue with DOL's Occupational Safety and Health Administration ("OSHA"), alleging retaliation by Perdue in violation of the FSMA. *See* Declaration of Roger A. Colaizzi, Ex. 1, Notice of Whistleblower Complaint (Feb. 23, 2015) ("Watts Complaint").[1] Perdue vigorously denies his claims, which Watts brought following years of complaints about compensation for growers in the industry and a video showing that Watts

---

[1] All Exhibits referenced in this Complaint are exhibits to the Colaizzi Declaration.

raised Perdue chicks in deplorable condition. After Perdue learned of the terrible manner in which Watts raised the chicks, it took remedial action to ensure that Watts would take proper care of the chicks entrusted to him. Watts alleges that the remedial action taken by Perdue constitutes retaliation prohibited by FSMA's whistleblower protections. *See id.* ¶ 57.

4.     Perdue is not asking this Court to litigate the merits of Watts' accusations. Instead, Perdue brings five constitutional challenges to the Administrative Proceedings.

5.     *First*, in *Jarkesy II*, the Supreme Court held that trying legal claims administratively violates the Seventh Amendment constitutional right to a jury trial. *See Jarkesy II*, 144 S. Ct. at 2127-28. Here, Watts' claims are legal in nature, seeking damages for emotional distress, lost profits, and backpay, and are close analogues to common-law wrongful-discharge actions for breach of contract and tort. The pending Administrative Proceedings deny Perdue its constitutional right to a jury trial.

6.     *Second*, separate from the Seventh Amendment right to a jury trial, Watts' claims implicate private rights (*e.g.*, the contractual relationship between Watts and Perdue and Perdue's right to property placed in direct issue by Watts' claims for damages), that must be adjudicated in an Article III court. Adjudicating those rights in an Article I tribunal violates Article III and the separation of powers vesting the judicial power exclusively in the judicial branch.

7.     *Third*, the FSMA statutory scheme accords Watts, a private litigant, power to kick out his claims to this Article III court and elect a jury trial, but without providing any intelligible standard to curb or even guide his discretion. Watts may even do so after an adverse ruling by the ALJ. By delegating unfettered legislative power to an individual litigant to decide whether his claims should be tried before an Article I ALJ or an Article III court with the right to a jury trial and full due-process protections unavailable in the OALJ, FSMA violates the nondelegation

3

doctrine of the constitutional separation of powers. *See Jarkesy v. SEC*, 34 F.4th 446, 459-63 (5th Cir. 2022) ("*Jarkesy I*"), *aff'd and remanded*, 144 S. Ct. 2117 (2024).

8. *Fourth*, OALJ's ALJs are unconstitutionally shielded from presidential oversight mandated by the Take Care Clause, U.S. Const. art. II, sec. 2, because they are doubly insulated from the presidential removal power: they can be removed *only* for cause and *only* by the Merit Systems Protection Board ("MSPB"), whose members can be removed *only* for cause by the President. In *Jarkesy I*, the Fifth Circuit held that such double insulation is unconstitutional. *See Jarkesy I*, 34 F.4th at 463-65.

9. *Fifth*, the OALJ proceedings violate due process because they lack basic procedural protections, such as the right to subpoena third parties for testimony and mandatory application of the Federal Rules of Evidence.

10. ALJ Kultgen has refused to consider any of these constitutional concerns regarding the administrative process, ruling that it exceeds her statutory authority as an ALJ; her ruling means that the issues cannot be considered by any court until years from now, when the case finally reaches the Fourth Circuit following multiple levels of internal DOL adjudication. Her ruling that she lacks power even to consider whether she has constitutional power to adjudicate the claims before her abdicates her fundamental duty to apply the laws and Constitution of the United States, pursuant to her oath of office. It vividly demonstrates why the claims do not belong in an Article I tribunal.

11. The *Jarkesy* decisions and another recent Supreme Court ruling, *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), have brought these concerns to a head. *Axon* held that parallel challenges to the constitutional authority of SEC and FTC ALJs are entitled to immediate "here-and-now" adjudication and, where appropriate, injunctive relief from an Article III district court.

4

*Id.* at 195. Under *Axon*, the district court may take swift action to prevent "here-and-now" injury by averting unconstitutional administrative enforcement proceedings without waiting for completion of the administrative process and limited judicial review by a circuit court of appeals.

12.    Perdue sits in the same precarious shoes as did the respective plaintiffs in *Axon*—facing an imminent unconstitutional administrative adjudication of claims against it that belong in an Article III court. And its constitutional deprivations plainly echo those brought in *Jarkesy*. To prevent the acute harm from being required to endure administrative proceedings that are facially and irreparably unconstitutional, this Court should preliminarily and permanently enjoin the proceedings, declare further proceedings unlawful, instruct the ALJ to dismiss the case, and grant such other relief as this Court deems necessary or proper.

## JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the United States Constitution as applied to a federal statute, FSMA, and seeks relief against officers of the United States. *Axon* expressly held that district courts have federal-question jurisdiction under § 1331 to review analogous claims that an agency's enforcement structure violates the Constitution. 598 U.S. at 195. No provision in FSMA or any "other law takes that power away." *Id.* at 211 (Thomas, J., concurring).

14.    This Court has the authority to grant injunctive and declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and its inherent equitable powers.

15.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B). The individual Defendants are acting in their official capacity as officers of an agency of the United States, and the federal agencies exercise authority in this District. A substantial part of the events or omissions giving rise to Perdue's claims occurred within this District. Watts' farm is located in Fairmont,

North Carolina, within this District, and most of the pertinent facts and events at issue in the administrative action took place there. ALJ Kultgen has scheduled the evidentiary hearing on the merits of Watts' claims to be held in Fayetteville, North Carolina, located within this District.

## <u>PARTIES</u>

16.     Plaintiff Perdue is a privately held Maryland corporation with its principal place of business in Salisbury, Maryland. Perdue is an integrated poultry producer engaged in business throughout the United States. It maintains multiple facilities in North Carolina and contracts with independent chicken growers in North Carolina and in other states.

17.     Defendant Julie Su is the Acting Secretary of Labor. She is statutorily responsible for investigating and adjudicating complaints filed pursuant to the FSMA. She is sued in her official capacity.

18.     Defendant Pamela Kultgen is the ALJ presiding over *Watts v. Perdue Farms Inc.*, No. 2016-FDA-0003 pending before the DOL's OALJ. She is sued in her official capacity.

19.     DOL is an agency of the federal government that, among other things, is statutorily tasked with investigating and adjudicating complaints filed pursuant to the FSMA. 21 U.S.C. § 399d(b).

20.     OALJ is responsible for adjudicating complaints filed pursuant to the FSMA.

21.     Defendant Craig Watts is an individual who resides in North Carolina.  Watts owns and operates C&A Farms in Fairmont, North Carolina, and he raised chickens for Perdue as an independent contractor under a written contract.

## BACKGROUND

### I.     Watt's Agreement with Perdue.

22.     Perdue is an integrated poultry producer engaged in business throughout the United States. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model). Within this integrated operation, Perdue owns hatcheries and breeding flocks. It delivers its chicks to independent contract growers, such as Watts. Independent growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *See id*.

23.     Watts is a farmer who raised chicks for Perdue under a standard independent-contractor agreement (the "Agreement"), in accordance with applicable Federal law and United States Department of Agriculture ("USDA") regulations. *See id*. at 684-85; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements). The Agreement imposed upon Watts, *inter alia,* extensive requirements to protect the well-being of the poultry.

24.     Watts' Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. The Agreement provided that Perdue would consign chicks and provide feed, fuel, medications, vaccinations, and other supplies to Watts. In exchange, Watts agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. Typically, chicks would be raised by contractor farmers for several weeks before removal.

25.     For years, Watts complained about the amount and system of compensation to which he agreed to accept in his independent contract with Perdue. Eventually, dissatisfied by a lack of improvement, Watts implemented a punitive scheme. Working with a cinematography group and at least one third-party activist group, in May 2014, Watts invited to his farm a film crew from a private third-party organization to film a group of live chicks that were recently placed

7

on his farm by Perdue when in good health. *See* Colaizzi Decl. Ex. 1, Watts Compl. ¶¶ 29, 30. According to Watts' complaint in the Administrative Proceedings, several weeks later, the private third-party organization returned to his poultry farm to film more footage of the flock, which was then nearing the end of its growth cycle. *See id.* ¶ 30. He alleges that the chickens were in deplorable condition. The third-party then allegedly edited the footage into a short video and released it on its website. *See id.* at ¶ 31.

26.    The video was not provided to Perdue by Watts or the third-party, nor was it submitted to a government agency, nor to any state attorney general. Instead, Perdue learned of the video from a news article published in *The New York Times* or from other third-party sources. The video revealed that Watts had failed to comply with his contractual biosecurity and animal welfare responsibilities in raising the chicks. For example, rather than euthanize sick and injured chickens in his flock as was his obligation, Watts kept some of them alive. Even Watts' initial complaint filed with OSHA described the chickens in his care as "panting and trampling each other to move around" and "laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts." *Id.*  ¶ 38. But Watts went even further. Armed with this footage showing his own poor treatment of the chicks in his care, Watts proclaimed in the video that the condition of his chickens showed they were not "humanely raised," as Perdue had indicated on product labels and in advertising for one of its consumer brands that was unrelated to the brand of chickens raised by Watts for Perdue.

27.    The posted video further revealed that, not only had Watts disregarded the welfare of the chickens under his care, but that he also had violated the "biosecurity" protocols designed to prevent the proliferation of infectious diseases in poultry flocks. Upon viewing the video, Perdue immediately sent its Poultry Welfare auditors to Watts' poultry farm to ascertain the condition of

the flock. Perdue also consulted a report from the non-profit Center for Food Integrity's Animal Care Review Panel (the "Panel"), which reviewed the private third-party's video and provided an assessment as to possible animal-welfare violations. In the Panel's report, three separate and independent experts concluded that Watts' complaints about the conditions in his chicken houses were his responsibility.

28.     Relying largely on the Panel's report, Perdue concluded that Watts needed to complete supplemental biosecurity and animal welfare training prior to the placement of a new flock with him, in order to prevent further poultry welfare and biosecurity violations. By a letter dated December 29, 2014, Perdue informed Watts of its decision.

## II.     Administrative Proceedings.

29.     Enacted in 2011, the FSMA provides whistleblower protections for "employees" of entities who are engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food that is subject to the Food, Drug, and Cosmetic Act ("FDCA").

30.     On February 23, 2015, Watts filed a whistleblower complaint in OSHA against Perdue alleging violations of the employee protection provisions of FSMA through purported employment retaliation by Perdue against his involvement in the third-party animal rights group's video. Watts argued that Perdue's labeling of chicken as "humanely raised" was misleading because he did not raise them humanely on his farm. According to Watts, following his participation in the video that documented the purported mislabeling, Watts was subjected to adverse employment actions, including increased scrutiny of Watts' operations, additional training prior to the placement of Perdue's next flock with Watts, a delay in the placement of his flock, and implementation of a Performance Improvement Program.

9

31.     The complaint sought "compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014[,[" plus "all other relief available at law and equity…." Colaizzi Decl. Ex. 1, Watts Compl. ¶¶ 58, 61.

32.     An OSHA regional investigator reviewed Watts' complaint and, on February 8, 2016, found it "to have no merit" because Watts was not an employee of Perdue. *See* Colaizzi Decl. Ex. 2, OSHA Findings. The investigator found that, under the test established in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), and a moderately different "right-to-control" test— both of which DOL uses to determine employee status under whistleblower statutes—Watts was not Perdue's employee. *Id.* at 2-3.

33.     Watts appealed to the OALJ. Perdue moved to dismiss, arguing that DOL lacked subject-matter jurisdiction because Watts' claims that Perdue fails to raise chickens humanely as advertised arise under the Poultry Product Inspections Act ("PPIA"), 21 U.S.C. § 451 et seq., a statute enforced by the USDA, and do not fall under the FSMA (generally enforced by the U.S. Food and Drug Administration (the "FDA"), and also by DOL regarding its employee protections). On January 6, 2017, DOL ALJ Dana Rosen agreed and dismissed Watts' complaint for lack of subject-matter jurisdiction. *See* Colaizzi Decl. Ex. 3, OALJ Dec. and Order.

34.     Watts then appealed to DOL's Administrative Review Board (the "ARB"), an internal appellate board. On March 5, 2019, the ARB affirmed ALJ Rosen's decision. *See* Colaizzi Decl. Ex. 4, ARB Dec.

35.     Watts appealed to the United States Court of Appeals for the Fourth Circuit. Before briefing began, DOL counsel moved for voluntary remand to the ARB for the limited purpose of permitting the FDA to file an amicus brief. *See* Colaizzi Decl. Ex. 5, DOL Mot. for Voluntary

Remand (Sept. 24, 2019). Without opinion, the Fourth Circuit granted the request and remanded the action back to the ARB. *See* Colaizzi Decl. Ex. 6, Order Granting Mot. for Remand (Jan. 7, 2020).

36.     On remand, FDA submitted an amicus brief that principally argued that live "poultry" raised on farms was "food" under the FDCA for all purposes, including issues concerning conditions under which the poultry was raised. *See* Colaizzi Decl. Ex. 7, FDA Amicus Br. 5-12 (Mar. 11, 2020). At the very end of its brief, the FDA asserted that, because "animal food is food," and because Perdue supplied Watts with animal food, this was an "independent" point that "may be relevant to the [ARB's] evaluation" of subject matter jurisdiction under the FSMA. *Id.* at 23. Perdue did not dispute that chicken feed constituted "food" under the FDCA but pointed out that none of Watts' claims concerned chicken feed supplied by Perdue.

37.     The ARB did not address FDA's principal argument and instead, on May 28, 2020, remanded the action back to the OALJ based upon the FDA's tail-end suggestion, ruling that, because Perdue "supplied the poultry animal feed for poultry on Watts' farm[,] ... Perdue is an entity who manufactures, process [sic], transports, or distributes 'food' within the meaning of the [FSMA] and thus is a covered entity." Colaizzi Decl. Ex. 8, ARB Dec. 6.

38.     On remand before the OALJ, on January 29, 2021, Perdue again moved to dismiss, raising arguments that had not yet been addressed by the OALJ or the ARB, including the fact that FSMA did not apply because none of Watts' specific claims involved chicken feed. That motion remained pending through April 21, 2022, when the case was reassigned to ALJ Kultgen.

39.     Watts then filed a supplemental complaint on April 25, 2022, which elaborated upon his allegations against Perdue but which still did not assert any issue with the chicken feed supplied by Perdue. *See* Colaizzi Decl. Ex. 9, Supplemental Whistleblower Compl. Most

important, Watts substantially expanded his requested relief to include (a) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue"; (b) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above"; (c) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014"; (d) attorney's fees and costs, which are "penalties" under the FSMA assessed at the Secretary's discretion; and (e) "all other relief available at law and equity." *Id.* ¶¶ 80, 81, 82, 85.

40.     ALJ Kultgen denied Perdue's motion to dismiss on October 21, 2022, ruling, *inter alia*, that the lack of any allegation about chicken feed was immaterial because she agreed with FDA's arguments that FDA, not USDA, had jurisdiction over how poultry are raised on farms. Discovery has ensued thereafter. *See* Colaizzi Decl. Ex. 10, OALJ Dec. and Order at 10-11.

41.     On March 11, 2024, Perdue applied for document and deposition subpoenas to explore, among other things, the video evidence forming the heart of Watts' claims. *See* Colaizzi Decl. Ex. 11, Resp.'s Application for Subpoenas. Just four days later, on March 15, 2024, the ALJ quashed Perdue's subpoena requests, ruling that the OALJ lacks statutory authority to issue subpoenas, based upon an ARB decision issued just two weeks earlier, *Fagan v. Dep't of the Navy*, ARB No. 2023-0006, 2024 WL 1091871 (Feb. 28, 2024), and finding no further authority in the FSMA to issue subpoenas. *See* Colaizzi Decl. Ex. 12, Order Quashing Subpoenas. This order effectively denied Perdue even the most basic discovery about the preparation and production of the most pivotal aspect of Watts' claims. Perdue moved for reconsideration or, in the alternative,

12

for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery constituted a denial of due process given the importance of the issue to the case. *See* Colaizzi Decl. Ex. 13, Resp.'s Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024). On April 24, 2024, ALJ Kultgen denied this motion as well. *See* Colaizzi Decl. Ex. 14, Order Denying Mot. to Certify Interlocutory Appeal.

       42.     The Supreme Court issued *Jarkesy II* on June 27, 2024. On July 19, 2024, Perdue promptly submitted a letter to the ALJ apprising her of the decision and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and also to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. The letter asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *See* Colaizzi Decl. Ex. 15, Resp.'s Letter Requesting Conference. Watts opposed the requests. *See* Colaizzi Decl. Ex. 16, Compl.'s Resp. to Request for Conference (July 19, 2024). Despite the extraordinary circumstances, on July 23, 2024 the ALJ denied the request for a conference call and a stay of discovery, ruling that ALJs "lack the power and authority to decide constitutional questions" and thus "cannot and will not grant any motion to dismiss on constitutional grounds." *See* Colaizzi Decl. Ex. 17, Order Denying Conference Call at 2. The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), for the principle that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.'" *Id*. It failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Even though the order denied Perdue's motion before the motion was ever filed, it allowed Perdue to file its motions to preserve Perdue's positions for appellate consideration. *Id.*

43. In a footnote, the ALJ suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id*. at 2 n.3.

44. On July 29, 2024, Perdue moved to dismiss for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II*. *See* Colaizzi Decl. Ex. 18, Resp.'s Mot. to Dismiss. The next day, Watts opposed the motions, reiterating that the OALJ could not consider constitutional challenges but making no specific arguments about whether *Jarkesy I or II* applied. *See* Colaizzi Decl. Ex. 19, Compl.'s Opp. to Mot. to Dismiss (July 30, 2024). He opposed any voluntary removal to federal court. *Id.* at 3.

45. On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend, ruling that she lacked authority to decide constitutional questions and could not grant the requested relief. *See* Colaizzi Decl. Ex. 20, Order Denying Mot. to Dismiss. She did, however, agree to amend the scheduling order and reschedule the hearing to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

46. Discovery is now set to close on January 17, 2025. A multi-day merits hearing is scheduled to commence on April 14, 2025 in Fayetteville, North Carolina. *Id.*

III. **The Unconstitutionality of the OALJ Proceedings against Perdue.**

47. The OALJ proceedings against Perdue are unconstitutional under *Jarkesy I* and *II*. Even though the OALJ is well aware of the constitutional bars, it has declined to act upon them—indeed, it has declined even to consider them—because, it says, administrative agencies are powerless to consider their lack of constitutional power to enforce the laws they administer.

48. The ALJ's refusal to consider whether her proceeding is unconstitutional vividly shows why Article I courts are not proper tribunals to adjudicate claims that sound in law and

involve private rights. This refusal violates her oath of office, forsaking the solemn duty to follow and apply the Constitution, which, pursuant to 5 U.S.C. § 3331, all officers of the United States except the President must swear.

49. The ALJ proceedings thus are unconstitutional and violate Perdue's rights.

50. The first reason that the ongoing proceedings are unconstitutional is that the proceedings violate Perdue's Seventh Amendment right to a jury trial. "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency[.]" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61 (1989). *Jarkesy II* holds that claims like Watts' claims against Perdue, which seek emotional-distress, lost profits, backpay, and other compensatory damages and penalties that sound in law, not equity, amount to a suit at common law and entitle Perdue to the protections of the Seventh Amendment. *See Jarkesy II,* 144 S. Ct. at 2128-31. OALJ proceedings do not allow for a jury trial. Allowing the claims to be tried by an ALJ without a jury would thus violate Perdue's constitutional rights and should be enjoined.

51. The second reason the Administrative Proceedings are unconstitutional is that they violate Article III and thus violate the separation of powers. Article III provides that the judicial power of the United States is vested "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Also pursuant to Article III, this judicial power "extend[s] to all Cases, in Law and Equity, arising under … the Laws of the United States." U.S. Const. art. III, § 2, cl. 1. Congress may not grant judicial power "on entities outside Article III." *Stern v. Marshall*, 564 U.S. 462, 484 (2011). Because lawsuits seeking money damages "implicate the core private right to property[,]" they must be brought in

15

an Article III judicial forum and cannot be heard by an Article I administrative tribunal. *See Axon*, 598 U.S. at 204 (Thomas, J., concurring).

52.     The third reason that the ongoing proceedings are unconstitutional is that the ALJ is insulated from the President's supervision by two levels of for-cause removal protection. The Secretary of Labor may remove ALJ Kultgen "only for good cause established and determined by the Merit Systems Protection Board ["MSPB"] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). MSPB members similarly may be removed by the President only for cause, *i.e.*, they "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). This double layer of for-cause removal violates Article II of the Constitution, which grants the power to execute federal law to the President "alone." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020). Under Article II, the President must have adequate "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 514-15 (2010). One layer of insulation from Presidential plenary power is acceptable, but two layers are not. *Id.* at 515; *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). Thus, the double layer of removal protection currently afforded to ALJs in the OALJ does not grant the President removal authority required by Article II and precludes further litigation under that scheme.

53.     Perdue has been injured by the lack of proper oversight over the OALJ. Presiding over a proceeding that is allegedly illegal without stopping to assess and address its illegality in the face of binding Supreme Court precedent is itself illegal and an abandonment of the ALJ's constitutional duty. In refusing even to consider the constitutionality of the proceedings, ALJ Kultgen has acted illegally and in derogation of her oath of office. Perdue therefore is directly

affected by a lack of proper oversight and ability to remove her due to her conduct as the presiding officer over the claims against Perdue.

54.     The fourth reason that the ongoing proceedings are unconstitutional is that they exceed legislative authority under Article I by violating separation of powers and the nondelegation doctrine. Here, FSMA accords private parties such as Watts unfettered discretion whether to proceed in an Article I court or whether to kickout his claims to an Article III tribunal by bringing them in a U.S. district court. Indeed, FSMA accords Watts this unilateral kickout power twice, first if OSHA does not reach a final decision on his claims within 210 days of the filing of his complaint, and again within 90 days after the Secretary of Labor renders her final decision in the matter. 21 U.S.C. § 399d(b)(4)(A). Because the federal proceedings are *de novo*, *id.*, this second kickout right gives Watts, but not Perdue, the unfettered right to treat the lengthy administrative process (*i.e.*, the ALJ hearing, ARB review, and final DOL decision) as if they never happened. Once removed to federal court, either party may demand a trial by jury. *Id.* Under the nondelegation doctrine, Congress may not delegate its legislative power to a non-legislative party to determine whether a matter belongs in an Article I or Article III court without providing an "intelligible principle" to guide the exercise of that power. *See Jarkesy I*, 34 F.4th at 459, 462-63. Here, the FSMA provides no such "intelligible principle" and instead allows *a private litigant*, Watts, the unilateral and plenary power to decide whether his claims will be heard in an Article III court, with full due-process protections, and subject to trial by jury, without affording any such authority to his adversary party, Perdue.

55.     The fifth and final reason that the ongoing proceedings are unconstitutional is that they violate due process. Perdue lacks the right to subpoena third parties for testimony and documents, depriving it of the basic right to discover facts concerning the key evidence in the case.

17

*See Souch v. Califano*, 599 F.2d 577, 580 (4th Cir. 1979) (holding that an ALJ's failure to issue a subpoena for testimony and documents underlying key adverse evidence violates claimant's due process rights). OALJ's ALJs "have broad discretion to limit discovery in order to expedite the hearing." 29 C.F.R. § 1987.107(b). Neither the Federal Rules of Evidence nor any other "[f]ormal rules of evidence" may be applied by the ALJ at the merits hearing. 29 C.F.R. § 1987.107(d). The ALJ has not been confirmed by the U.S. Senate as meeting the high standards expected from an Article III judge to exercise judicial power and preside over a trial. She has ruled that she lacks authority and will not consider fundamental constitutional questions concerning subject-matter jurisdiction, in stark contrast to an Article III court's inherent judicial authority to determine whether actions by Article I officers violate the Constitution. *See Marbury v. Madison*, 5 U.S. 137, 176-78 (1803). As *Marbury* aptly put it, "[t]his is of the very essence of judicial duty." *Id.* at 178.

56. Each of those violations of fundamental fairness is compounded by DOL's right under its own regulations to join the proceedings at any time and effectively serve as both litigant/prosecutor and adjudicator/ultimate decision-maker in a single matter. Under 29 C.F.R. § 1987.108(a)(1), the Assistant Secretary for OSHA has plenary discretion to "participate at any time at any stage of the proceeding" as either a party or as an amicus curiae, including the right to petition for review of an ALJ decision or an ALJ's approval or disapproval of any settlement between the parties. Depending on the stage of the proceedings, a settlement between the parties must be approved by OSHA, the ALJ, or the ARB, respectively. 29 C.F.R. § 1987.111(a), (b), & (d). Finally, for good cause or under "special circumstances not contemplated" in the regulations (which are undefined and thus unbounded), both the ALJ and the ARB may waive any rule or regulation governing their respective proceeding. 29 C.F.R. § 1987.115.

18

57.     Perdue's private adversary, Watts, has unfettered discretion and absolute control over which tribunal will hear his claims. No comparable right extends to Perdue. Adding insult to injury, if he loses in the DOL, Watts has the further right to refile his claims in federal district court for *de novo* proceedings, until 90 days after the Secretary's final ruling, giving him (but not Perdue) an outrageous advantage of testing the Article I waters and then removing the claims to federal court should he ultimately decide that he might fare better if given a second chance by litigating in a different forum.

58.     The Supreme Court has made it perfectly clear that the deprivation of a constitutional right constitutes an irreparable injury, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and that the time to review and resolve such constitutional violations is now. *Axon*, 598 U.S. at 191. *Axon* holds that federal district courts should rule on constitutional challenges to agency enforcement proceedings to prevent "here-and-now" injuries that "cannot be undone" through appellate review, and thus must be ruled upon as they arise. *Id.* Under *Axon*, the proceedings should be enjoined, as appellate review following a final decision by the Secretary cannot remedy the constitutional violations, nor can the unconstitutional nature of the proceedings be severed to redress the injury without affecting the adjudication.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF SEVENTH AMENDMENT**
**Against All Defendants**

59.     Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

60.     The Seventh Amendment entitles parties to a jury trial of claims that are "'legal in nature.'" *Jarkesy II*, 144 S. Ct. at 2128 ((citation omitted).

61.     Watts' claims against Perdue are legal in nature because they are akin to an 18th century common-law claim for breach of action or a personal-injury tort claim for damages, and because he seeks compensatory damages, including damages for emotional distress, lost profits, and backpay, and penalties under FSMA for attorney's fees and costs.  *See id.* at 2129 (describing "money damages" as a "prototypical common law remedy").

62.     The value in controversy exceeds twenty dollars.

63.     Watts' claims against Perdue seeking a personal award of money damages do not fall within the narrow "public rights" exception to the Seventh Amendment's right to a jury trial. *See id*. at 2131-34.

64.     ALJ Kultgen's adjudication of Watts' claims violates Perdue's Seventh Amendment right to a trial by jury and constitutes an ongoing irreparable "here-and-now" harm to Perdue.

## COUNT II

### VIOLATION OF ARTICLE III
### Against All Defendants

65.     Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

66.     Because Watts is seeking compensatory damages and penalties, and further seeks to adjudicate the parties' private contract rights, Perdue's private rights are at stake in the Administrative Proceedings.

67.     Claims involving private rights cannot be removed from the jurisdiction of the Article III courts. The types of claims Watts is asserting and the relief Watts seeks implicate the judicial power, which Article III of the Constitution vests exclusively in the federal courts. By adjudicating the claims before an Article I ALJ and subsequent administrative review and decision,

20

Watts' election to proceed in the OALJ usurps what the Constitution leaves to the exclusive jurisdiction of Article III courts.

68.     Watts' claims do not implicate administrative expertise or efficiency. They do not require administrative adjudication, nor are they uniquely suited to administrative adjudication, as similar "actions are commonly considered by federal courts or without the federal government's involvement." *Jarkesy I*, 34 F.4th at 459.

69.     Accordingly, ALJ Kultgen's and DOL's continued administrative adjudication of Watts' claims violates Article III of the Constitution and constitutes an ongoing irreparable harm to Perdue.

## COUNT III

### VIOLATION OF PRESIDENT'S REMOVAL AUTHORITY UNDER ARTICLE II
### Against All Defendants

70.     Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

71.     Article II of the Constitution provides that the President must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and vests the President with the sole "authority to remove those who assist him." *Free Enter. Fund*, 561 U.S. at 513-14.

72.     DOL ALJs are "inferior officers" within the executive branch of the United States subject to the President's removal authority.

73.     The Secretary of Labor may remove ALJ Kultgen "only for good cause established and determined by the [MSPB]." 5 U.S.C. § 7521(a).

74.     MSPB members, in turn, may be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

21

75. Accordingly, even though she is exercising executive authority, two levels of for-cause removal protections insulate ALJ Kultgen from presidential control, which violates Article II of the Constitution and irreparably harms Perdue.

76. This violation of Article II is not severable or mitigable. Per *Axon*, it inflicts an actionable "here-and-now" injury. The ALJ's ruling (and, apparently, official OALJ policy) that she lacks authority to consider whether the Administrative Proceedings against Perdue are unconstitutional, violates her oath of office and is illegal conduct warranting Presidential oversight.

77. Perdue is thus entitled to relief "to ensure that the [legal] standards to which [Perdue is] subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.

## COUNT IV

### VIOLATION OF NONDELEGATION DOCTRINE
### AND SEPARATION OF POWERS UNDER ARTICLE I
### Against All Defendants

78. Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

79. Under the separation of powers required by the Constitution, Congress may delegate legislative authority to an administrative agency only if it provides an "intelligible principle" by which that agency can exercise that power. *See Jarkesy I*, 34 F.4th at 459, 462-63.

80. The FSMA provides no such "intelligible principle." Once 210 days have lapsed since Watts filed his initial complaint, under FSMA, Congress grants to Watts—not even an administrative agency—unfettered discretion to adjudicate his FSMA claims in either an administrative proceeding before the OALJ with up to two further levels of DOL administrative

review, or in federal court with a mutual option to elect a trial by jury. That right re-vests for 90 additional days after the Secretary of Labor issues her final decision, when Watts may move his claims to an Article III federal court for *de novo* adjudication—giving him, but not Perdue, the unfettered right to a do-over should he receive an adverse result in the Administrative Proceedings. Despite vesting legislative power in a private party to select between an Article I and an Article III tribunal, Congress failed to provide any standard, guidance, or intelligible principle on how that party should exercise its discretion.

81.     Congress has exceeded its Article I authority by delegating to a third party, in this case a private party (Watts), the power to choose (twice, at separate junctures) whether to keep an action before the DOL or to move it to an Article III court.

82.     Congress's delegation of authority to a private party, unconstrained by an intelligible principle, to decide whether to subject his private dispute with Perdue to administrative adjudication, violates Article I of the Constitution, the separation of powers required by the Constitution, and the nondelegation doctrine limiting congressional authority.

83.     The FSMA statutory scheme constitutes a more egregious violation of the nondelegation doctrine than did the securities laws at issue in *Jarkesy I* and *II*. There, the third party was a different government agency, the SEC. Here, Watts is an adverse private-party litigant, who has been vested with unfettered, plenary discretion, without any controlling limit or principle, to deny Perdue its statutory option under the FSMA and constitutional rights under the Seventh Amendment to have a jury hear and decide its case. In exercising this unfettered power, Watts has a 100% personal financial interest in securing the maximum possible judgment without any accountability to anyone or any guiding intelligible standard to limit his exercise of that authority.

84.     The FSMA's violation of the separation of powers and the nondelegation doctrine thus violates the Constitution and constitutes an ongoing irreparable harm to Perdue.

**COUNT V**

**VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE**
**Against All Defendants**

85.     Perdue re-alleges and incorporates by reference each of the preceding paragraphs and allegations.

86.     The purported lack of statutory power to issue third-party subpoenas facially violates Perdue's due-process rights under the Fifth Amendment and materially impairs Perdue's ability to defend itself in the OALJ proceeding. This harm is especially acute as applied in this case, where Perdue needs third-party subpoenas to investigate the key evidence in the case—the video footage filmed on Watts' farm that constitutes the heart of Watts' retaliation claims against Perdue. Under DOL regulations, the ALJ has broad discretion to limit discovery in order to expedite the merits hearing.

87.     The acute harm from a lack of basic discovery of documents and testimony about key evidence in the case could be compounded by the inapplicability of the Federal Rules of Evidence, creating substantial uncertainty as to what evidentiary rules will govern the Administrative Proceedings.

88.     If the action had been brought in an Article III court, as is constitutionally required, Perdue would be granted subpoena power and full discovery rights, and would be granted the full constitutional protections afforded by Article III courts.

89.     Due process is denied when an ALJ relies upon certain evidence as the basis for their decision yet denies a request to subpoena documents or testimony directly related to that evidence and potentially undermines it. *See Souch v. Califano*, 599 F.2d 577 (4th Cir. 1979).

24

90. Due process is further denied by the statutory scheme in FSMA, which accords an adverse private party, Watts, unfettered discretion to control whether Purdue can adjudicate its defenses in an Article III court and try them before a jury. FSMA even provides Watts—but not Perdue—the right to redo the case in an Article III federal court should he lose in the DOL.

91. Because FSMA authorizes Watts, a private third-party adverse actor, to choose whether Perdue is afforded the protections of an Article III court; whether Perdue is given the opportunity to defend itself in front of a neutral Article III judge who meets constitutional requirements; whether to erase an adverse result in the DOL by moving his claims to federal court for *de novo* review; and whether or not Perdue can access its Seventh Amendment right to a jury trial, the ongoing Administrative Proceedings violate Perdue's due-process rights by implicating fundamental questions of fairness.

92. FSMA also accords DOL a right to participate at any time and then become both prosecutor and adjudicator, including the rights to petition for review of ALJ orders and to approve or disapprove of settlements between the parties. The statutory scheme thus violates Perdue's due-process rights to a fair and impartial adjudicator by allowing DOL to participate in dual roles.

93. The ALJ's ruling that she lacks any authority to consider constitutional challenges to her authority further violates Perdue's due-process rights, as it deprives Perdue of an adjudicator who can fulfill "the very essence of judicial duty." *Marbury*, 5 U.S. at 178. Requiring a litigant to endure years of illegal, unconstitutional litigation because the tribunal declares that it lacks power to halt its own extra-jurisdictional proceedings is fundamentally unfair and thus violates due process.

94. This one-sided, fundamentally unfair scheme is inherent in the underlying proceedings and thus constitutes an ongoing irreparable harm to Perdue and should be enjoined.

25

## PRAYER FOR RELIEF

For these reasons, Perdue respectfully requests that this Court:

1. Preliminarily and permanently enjoin Defendants from continuing the pending ALJ proceedings against Perdue;

2. Declare that the Administrative Proceedings against Perdue are unlawful and that Defendants may not proceed with such proceedings;

3. Award such other and further relief as this Court may deem just and proper, including but not limited to reasonable attorney's fees and costs.

Dated: August 20, 2024                    Respectfully submitted,


_____/s/ Margaret Santen_____
Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com


_____/s/ Vanessa N. Garrido_____
Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

Roger A. Colaizzi (notice of special appearance to be filed)
Kristin M. Koger (notice of special appearance to be filed)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001

26

202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (notice of special appearance to be filed)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*