**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**CASE NO. 5:24-cv-00477-BO-RJ**

| | |
|---|---|
| **PERDUE FARMS INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **JULIE SU**, in her official capacity as Acting Secretary of the U.S. Department of Labor, et al., <br><br> Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

**PLAINTIFF PERDUE FARMS INC.'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ....................................................................................................1

STATEMENT OF FACTS ................................................................................................2

I.      Watts' Relationship with Perdue. ........................................................................3

II.      Watts' Dispute with Perdue. ................................................................................3

III.      The DOL Administrative Proceedings....................................................................4

IV.      *Jarkesy* and Perdue's Constitutional Challenge...................................................7

STANDARD OF REVIEW ..............................................................................................8

ARGUMENT ....................................................................................................................8

I.      This Court Has Subject-Matter Jurisdiction over Perdue's Constitutional Claims. ..............................................................................................................8

II.      The DOL Administrative Proceedings Violate Perdue's Right to a Jury Trial under the Seventh Amendment. .................................................................12

       A.      Watts' FSMA Claim Is Analogous to 18th Century Common-Law Claims for Breach of Contract and Tort. ................................................13

       B.      Watts Seeks Compensatory Damages and Other Legal Relief.............15

       C.      The Public-Rights Exception Does Not Apply........................................19

III.      The DOL Administrative Proceedings Violate Perdue's Right to Adjudicate Watts' Claim in an Article III Court. ..............................................20

IV.      DOL ALJs Violate the Presidential Removal Power of Article II....................21

V.      The DOL Proceedings Violate the Nondelegation Doctrine. ...........................24

VI.      The DOL Proceedings Violate Due Process.......................................................26

VII.      Perdue Is Entitled to a Permanent Injunction. .................................................27

CONCLUSION ...............................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABM Indus. Grps., LLC v. DOL*,
___ F. Supp. 3d ___, 2024 WL 4642962 (S.D. Tex. 2024)......................................................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................................8

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023)......................................................................................................... *passim*

*Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ...................................................................................................27

*Browsher v. Synar*,
478 U.S. 714 (1986)..................................................................................................................23

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)..................................................................................................................25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................................................8

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) ...................................................................................................28

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
494 U.S. 558 (1990)..................................................................................................................18

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1999)............................................................................................................14, 17

*Cochran v. SEC*,
20 F.4th 194 (5th Cir. 2021) (en banc) ...................................................................................23

*Collins v. Yellen*,
594 U.S. 220 (2021)............................................................................................................22, 23

*Crowell v. Benson*,
285 U.S. 22 (1932)....................................................................................................................24

*Curtis v. Loether*,
415 U.S. 189 (1974)..................................................................................................................14

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962)................................................................................................................18

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013) ...................................................................................................8

 *Decker Coal Co. v. Pehringer*,
    8 F.4th 1123 (9th Cir. 2021) ...................................................................................................22

*Design Strategies, Inc. v. Davis*,
    367 F. Supp. 2d 630 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006) .............................17

*Dimick v. Schiedt*,
    293 U.S. 474 (1935)................................................................................................................13

*Eichorn v. AT&T Corp.*,
    484 F.3d 644 (3d Cir. 2007)....................................................................................................18

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................................................28

*Exec. Benefits Ins. Agency v. Arkison*,
    573 U.S. 25 (2014)..................................................................................................................20

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998)................................................................................................................17

*Fleming v. USDA*,
    987 F.3d 1093 (D.C. Cir. 2021) ..............................................................................................22

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010)........................................................................................................ *passim*

*Garvey v. Admin. Rev. Bd.*,
    56 F.4th 110 (D.C. Cir. 2022)..................................................................................................20

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ..................................................................................................28

*Goettsch v. Goettsch*,
    29 F. Supp. 3d 1231 (N.D. Iowa 2014)....................................................................................17

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989)..................................................................................................................15

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)................................................................................................................18

*Halliburton, Inc. v. Admin. Rev. Bd.*,
  771 F.3d 254 (5th Cir. 2014) ...............................................................................................14

*Hammond v. Northland Counseling Ctr., Inc.*,
  218 F.3d 886 (8th Cir. 2000) ...............................................................................................16

*Isrealitt v. Enter. Servs. LLC*,
  78 F.4th 647 (4th Cir. 2023) ................................................................................................15

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) .....................................................................................7, 21, 22, 24

*Jones v. Southpeak Interactive Corp. of Del.*,
  777 F.3d 658 (4th Cir. 2015) ...............................................................................................16

*K & R Contractors LLC v. Keene*,
  86 F.4th 135 (4th Cir. 2023) .........................................................................................22, 23

*Leachco, Inc. v. CPSC*,
  103 F.4th 748 (10th Cir. 2024) ............................................................................................22

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) (en banc) .................................................................................28

*Lebow v. Am. Trans Air, Inc.*,
  86 F.3d 661 (7th Cir. 1996) .................................................................................................14

*Lucia v. SEC*,
  585 U.S. 237 (2018)..............................................................................................................21

*Marbury v. Madison*,
  5 U.S. 137 (1803)..................................................................................................................26

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993)........................................................................................................16, 17

*Mistretta v. United States*,
  488 U.S. 361 (1989)..............................................................................................................24

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985)..............................................................................................................11

*N.Y. St. Inspection, Sec. & L. Enf't Emps., Dist. Council 82 v.
  N.Y. St. Pub. Emp. Rels. Bd.*,
  629 F. Supp. 33 (N.D.N.Y. 1984)........................................................................................27

*Oklahoma v. United States*,
  62 F.4th 221 (6th Cir. 2023) ................................................................................................25

*Pandazides v. Va. Bd. of Educ.*,
13 F.3d 823 (4th Cir. 1994) ............................................................................15, 18

*Pittston Co. v United States*,
368 F.3d 385 (4th Cir. 2004) .................................................................................25

*Pons v. Lorillard*,
549 F.2d 950 (4th Cir. 1977), *aff'd*, 434 U.S. 575 (1978) .......................................18

*Reich v. Cambridgeport Air Sys., Inc.*,
26 F.3d 1187 (1st Cir. 1994)...................................................................................15

*Rose v. PSA Airlines*,
80 F.4th 488 (4th Cir. 2023) .............................................................................17, 18

*Ross v. Bernhard*,
396 U.S. 531 (1970)...............................................................................................16

*SEC v. Jarkesy*,
603 U.S. 109 (2024)........................................................................................ *passim*

*Seila L. LLC v. CFPB*,
591 U.S. 197 (2020)..........................................................................1, 2, 22, 23

*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*,
298 F.3d 955 (9th Cir. 2002) .................................................................................18

*Souch v. Califano*,
599 F.2d 577 (4th Cir. 1979) .................................................................................26

*Stern v. Marshall*,
564 U.S. 462 (2011)...............................................................................................20

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994).................................................................................7, 9, 10, 11

*United States v. Diebold, Inc.*,
369 U.S. 654 (1962)...............................................................................................8

*Waldrop v. S. Co. Servs., Inc.*,
24 F.3d 152 (11th Cir. 1994) ............................................................................14, 18

*Withrow v. Larkin*,
421 U.S. 35 (1975)..................................................................................................27

*Wooddell v. IBEW, Loc. 71*,
502 U.S. 93 (1991)..................................................................................................16

## Statutes and Rules

Federal Rule of Civil Procedure 56(a) ................................................................................8

29 C.F.R. § 1987.107(b), (d)................................................................................26

29 C.F.R. § 1987.108(a)(1)................................................................................27

29 C.F.R. § 1987.115 ................................................................................26

5 U.S.C. § 1202(d) ................................................................................22

5 U.S.C. § 7521(a) ................................................................................22

21 U.S.C. § 399d................................................................................ *passim*

21 U.S.C. § 451................................................................................5

42 U.S.C. § 1981................................................................................13

U.S. Const. Art. II, § 3 ................................................................................21

Plaintiff Perdue Farms, Inc. ("Perdue"), by its undersigned attorneys, submits the following Memorandum in Support of its Motion for Summary Judgment.

<u>**NATURE OF THE CASE**</u>

Recent Supreme Court precedent holds that federal administrative agencies may not adjudicate principally private disputes and make awards of compensatory damages—those disputes are subject to the judicial power of Article III courts and the Seventh Amendment's right to trial by jury. *See SEC v. Jarkesy*, 603 U.S. 109 (2024) ("*Jarkesy II*"). The Court also has rejected administrative agencies' use of adjudicative officers who are twice insulated from presidential removal. *See Seila L. LLC v. CFPB*, 591 U.S. 197 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010). And it has made clear that the U.S. District Courts have subject-matter jurisdiction to enforce these constitutional boundaries and rights. *Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023).

These rulings give rise to this action. Perdue is the subject of a whistleblower complaint filed by Defendant Craig Watts, a former chicken farmer with Perdue, in the Office of Administrative Law Judges ("OALJ") in the U.S. Department of Labor ("DOL") brought under the Food Safety Modernization Act ("FSMA"), 21 U.S.C. § 399d. Watts claims that Perdue constructively discharged him in retaliation for his activities in publicizing allegedly unsafe growing conditions for Perdue chicks. Watts seeks compensatory damages, including emotional distress, damage to reputation, and lost profits. The proceedings are in the discovery phase with an evidentiary hearing scheduled for June.

Watts' claims are fundamentally legal in nature, involving private rights and compensatory remedies. Thus, per *Jarkesy II*, they *must* be adjudicated in an Article III court, where Perdue is entitled to receive a jury trial under the Seventh Amendment. *See* 603 U.S. at 140. Supreme Court

1

precedent also makes clear that requiring Perdue to proceed all the way through administrative-agency proceedings, without an opportunity to lodge critical constitutional challenges until the case ultimately reaches the Fourth Circuit for judicial review of a final agency decision, constitutes an actionable "here-and-now" injury. *See Axon*, 598 U.S. at 191. This Court therefore has subject-matter jurisdiction to hear Perdue's constitutional challenges to DOL's administrative proceedings now, while the injury is occurring.

The DOL proceedings are unconstitutional for five separate *legal* reasons (Counts I-V):

1. This case falls squarely within *Jarkesy II*, 603 U.S. at 120-21, 123.

2. Because Watts' claims involve a largely private dispute over an alleged wrongful discharge, they must be tried in an Article III court.

3. DOL's ALJs violate Article II because they are insulated from the President's removal authority by two layers of for-cause tenure protection. *See Seila L.*, 591 U.S. at 215; *Free Enter. Fund*, 561 U.S. at 495, 514.

4. FSMA violates the nondelegation doctrine by vesting Watts, a private party, with legislative power to elect to use both administrative and judicial tribunals to decide his claims.

5. FSMA violates Perdue's right to due process by, *inter alia,* giving Watts, but not Perdue, power to re-file his claims in federal court following an unfavorable outcome in the DOL, and by denying Perdue the right to subpoena third parties.

These constitutional challenges are purely legal claims. Because, as a matter of law, DOL's proceedings are unconstitutional under *Jarkesy II* and other controlling precedent, and no material facts are in genuine dispute, Perdue is entitled to summary judgment, and this Court should enter declaratory and injunctive relief in Perdue's favor.

## <u>STATEMENT OF FACTS</u>

The following facts are set forth in the accompanying Plaintiff's Local Civil Rule 56.1 Statement of Undisputed Material Facts ("PSUF"), which in turn cites to Perdue's Appendix

2

thereto containing the evidence supporting Perdue's factual assertions. Much of that evidence consists of the parties' allegations in the underlying DOL administrative proceedings.

## I. Watts' Relationship with Perdue.

Watts is a poultry farmer who owns and operates C&A Farms in Fairmont, North Carolina. (PSUF ¶ 1). Perdue is an integrated poultry producer engaged in business throughout the United States, including North Carolina. (PSUF ¶ 2). Perdue alleges that, under its business model, Perdue owns hatcheries and breeding flocks; it delivers its chicks to independent contract growers, such as Watts. (PSUF ¶ 3). The growers provide the land, facilities, equipment, and labor to raise their chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id*.

Watts raised chicks for Perdue under a written Poultry Producer Agreement imposing extensive U.S. Department of Agriculture requirements that Watts must follow to protect the well-being of the poultry. (PSUF ¶ 4). He agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. (PSUF ¶ 5). Typically, chicks were raised by contractor farmers for several weeks before removal. *Id.* Watts' agreement with Perdue renewed with each flock, and either party had the authority to terminate the agreement with 90-days' notice. *Id.*

Watts and Perdue disagree as to the legal status of their relationship (employee vs. independent contractor), but that issue is not material here.

## II. Watts' Dispute with Perdue.

For years, Watts complained about the amount and system of compensation from Perdue, to no avail. (PSUF ¶ 6). Watts therefore pursued a different course.

Watts alleges that, in May 2014, he invited a cinematography group and at least one third-party activist group to his farm to film a group of live chicks recently placed by Perdue. (PSUF ¶ 7). Several weeks later, the private third-party organization returned to his poultry farm to film

3

more footage of the flock, which was then nearing the end of its growth cycle. *Id.* The third-party organization then allegedly edited the footage into a short video and released it on its website. *Id.* The video received coverage in national news media. *Id.*

Watts alleges that the chickens were in deplorable condition. His complaint describes the chickens in his care as "panting and trampling each other to move around" and "laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts." *Id.* He alleges that the condition of his chickens showed they were not "humanely raised," as Perdue had indicated on product labels and in advertising, *id.*, albeit for a different brand.

Perdue, in turn, alleges in the DOL proceedings that the video demonstrates that Watts failed to comply with his contractual biosecurity and animal-welfare responsibilities in raising the chicks. (PSUF ¶ 8). For example, rather than euthanize sick and injured chickens in his flock as was his obligation, Watts kept some of them alive, despite manifest suffering of multiple chicks from incurable deformities. *Id.* The video showed chickens in considerable heat distress, yet Watts' ventilation fans were not operating. *Id.* Perdue also alleged that he had violated the "biosecurity" protocols preventing proliferation of infectious diseases in poultry flocks. *Id.*

Perdue asserts that it sent its Poultry Welfare auditors to Watts' farm to ascertain the flock's condition. (PSUF ¶ 9). A panel of three independent experts selected by the non-profit Center for Food Integrity's Animal Care Review Panel reviewed the video and concluded that Watts' complaints about conditions in his chicken houses were *his* responsibility, not Perdue's. *Id.* Relying largely on this report, on December 29, 2014, Perdue told Watts he had to complete biosecurity and animal-welfare training prior to placement of a new flock. (PSUF ¶ 10).

### III. The DOL Administrative Proceedings.

On February 23, 2015, Watts filed a whistleblower complaint with the Occupational Safety and Health Administration ("OSHA") alleging that Perdue had violated FSMA's employee-

protection provisions by retaliating against his involvement in the video. (PSUF ¶ 11). Watts argued that Perdue's labeling of chicken as "humanely raised" was misleading because he did not raise them humanely on his farm. *Id.* He further claimed adverse employment actions, including increased scrutiny of operations, additional training prior to the placement of his next flock, a delay in the placement of his flock, and implementation of a performance improvement program. *Id.* He sought "compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014[,]" plus "all other relief available at law and equity." *Id.*

On February 8, 2016, an OSHA regional investigator found that Watts was not an employee of Perdue, and the complaint was dismissed. (PSUF ¶ 12). Watts appealed to the OALJ, and Perdue moved to dismiss, arguing that DOL lacked subject-matter jurisdiction because Watts' claims arise under the Poultry Product Inspections Act, 21 U.S.C. § 451 *et seq.*, a statute enforced by USDA, not the FSMA, which generally is enforced by the FDA. (PSUF ¶ 12.) On January 6, 2017, a DOL ALJ agreed and dismissed Watts' complaint. *Id.* Watts appealed to DOL's Administrative Review Board ("ARB"), which affirmed on March 5, 2019. *Id.*

Watts appealed to the Fourth Circuit. Before briefing, DOL moved for voluntary remand to the ARB so FDA could file an amicus brief. *Id.* The Fourth Circuit granted the request and remanded to the ARB on January 7, 2020. *Id.* Before the ARB, FDA principally argued that live "poultry" raised on farms was "food" under the FDCA for all purposes, including allegations concerning conditions under which the poultry was raised. (PSUF ¶ 13). At the end of its brief, the FDA briefly noted that "animal food is food" and Perdue supplied Watts with animal food—even though none of Watts' claims concerned chicken feed supplied by Perdue. *Id.* On December

5

6, 2020, the ARB agreed and remanded to the OALJ, ruling that, because Perdue is subject to FSMA because it "supplied the poultry animal feed on Watts' farm[.]" *Id.*

Perdue moved to dismiss in the OALJ on January 29, 2021. (PSUF ¶ 14). That motion remained pending through April 21, 2022, when the case was reassigned to ALJ Pamela Kultgen. *Id.* Watts never sought to revive the dormant proceedings until he filed a supplemental complaint on April 25, 2022. *Id.* His new requested relief included: (a) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue"; (b) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above"; (c) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014"; (d) attorney's fees and costs; and (e) "all other relief available at law and equity." (PSUF ¶ 15).

ALJ Kultgen denied Perdue's motion to dismiss on October 21, 2022. (PSUF ¶ 16). Discovery ensued. On March 11, 2024, Perdue applied for document and deposition subpoenas to explore, *inter alia*, the video evidence forming the heart of Watts' claims. (PSUF ¶ 17). The ALJ *sua sponte* quashed these requests four days later, ruling that OALJ lacks statutory authority to issue subpoenas. *Id.* Perdue moved for reconsideration or, in the alternative, for certification of interlocutory appeal, arguing that denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims. *Id.* On April 24, 2024, ALJ Kultgen denied this motion. *Id.*

6

## IV. *Jarkesy* and Perdue's Constitutional Challenge.

On June 27, 2024, the Supreme Court issued *Jarkesy II*, holding that SEC administrative enforcement proceedings violate the Seventh Amendment right to a jury trial and must be heard in an Article III court. *See* 603 U.S. at 120–21. The Court declined to consider holdings by the Fifth Circuit that SEC proceedings are unconstitutional because (i) Congress ceded its legislative power over where such claims should be brought, violating the nondelegation doctrine and separation of powers; and (ii) SEC ALJs are unconstitutionally doubly insulated from the presidential removal power. *See id.*; *Jarkesy v. SEC*, 34 F.4th 446, 459–65 (5th Cir. 2022) ("*Jarkesy I*").

On July 19, 2024, Perdue apprised the ALJ of its intent to move to dismiss for lack of subject-matter jurisdiction, and to seek leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (PSUF ¶ 18). Perdue asked for a conference call to discuss a briefing schedule and a temporary stay of discovery. *Id*. Watts opposed. *Id.* On July 23, 2024, the ALJ denied the request, ruling that DOL ALJs "lack the power and authority to decide constitutional questions," and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." *Id.* The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), that agencies generally lack authority to adjudicate "'constitutionality of congressional enactments,'" *id*. at 215 (cleaned up), but failed to mention *Thunder Basin*'s next sentence stating that "[t]his rule is not mandatory," *id.* A footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." (PSUF ¶ 18).

Perdue moved to dismiss based upon *Jarkesy I* and *II* on July 29, 2024. (PSUF ¶ 19). Watts opposed and further opposed any voluntary removal to federal court. *Id.*

On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend, again ruling that she lacked authority to decide constitutional questions. (PSUF ¶ 20). She did,

however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.*

## STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If the movant has made this threshold demonstration, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Likewise, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

## ARGUMENT

**I.      This Court Has Subject-Matter Jurisdiction over Perdue's Constitutional Claims.**

Pursuant to *Axon*, this Court has subject-matter jurisdiction over Perdue's constitutional challenges to the structure of the DOL proceedings. *See* 598 U.S. at 195. As *Axon* explains, "[t]he *ordinary statutory review scheme does not preclude* a district court from entertaining"

8

constitutional challenges to the structure of administrative agencies. *Id.* at 180 (emphasis added). As was the case with the two sets of administrative proceedings at issue in *Axon* (FTC and SEC), subjecting Perdue to "unconstitutional agency authority" imposes a "here-and-now injury" that "is impossible to remedy once the [administrative] proceeding is over." *Id.* at 191 (describing "the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process"). In other words, unless the administrative proceedings are enjoined, Perdue "will lose [its] rights not to undergo the complained-of agency proceedings." *Id.* at 192.

*Axon* is on all fours here. FSMA's statutory review scheme and the nature of Perdue's claims match those presented in *Axon* and require the same outcome. Additionally, the *Thunder Basin* factors, which underlie the *Axon* holding, point in the same direction.

**1.** In opposing Perdue's motion for preliminary injunction, DOL argued that FSMA's statutory review scheme prohibits review in this Court because it allows eventual review upon appeal. Not so. FSMA's judicial review scheme is ordinary in every way. FSMA's judicial-review scheme, 21 U.S.C. § 399d(b)(5), is no different than the scheme reviewed in *Axon* and does not prohibit *every* collateral constitutional challenge. Section 399d(b)(5)(A) merely addresses review by a U.S. Court of Appeals of a "final order" by DOL, and Section 399d(b)(5)(B) merely states that such *final* orders "shall not be subject to judicial review in any criminal or other civil proceeding." In short, far from restricting judicial review of all aspects of FSMA proceedings, FSMA's statutory bar applies only to *final agency orders*. No final order has issued here because Watts' claims have not been adjudicated. Indeed, Perdue is not seeking review of *any* ALJ order—rather, Perdue is collaterally challenging "the structure or very existence of" DOL's administrative process. *Axon*, 598 U.S. at 189. *Axon* holds that district courts have jurisdiction to hear such

9

claims, and FSMA's "ordinary statutory review scheme" poses no bar to its exercise, let alone an "explicit[]" prohibition. *Id.* at 180, 185.

The same scheme allowing appellate review of an appeal from a final agency order existed in *Axon*, and it did not foreclose collateral constitutional challenge in an Article III court. Justice Gorsuch's concurrence in *Axon* explains why in clear terms:

> [T]he government directs our attention to § 78y(a)(1) of the Exchange Act. That provision says that '[a] person aggrieved by a final order of the Commission . . . may obtain review of the order in the United States Court of Appeals . . . by filing in such court . . . a written petition requesting that the order be modified or set aside in whole or in part.' . . . Plainly, the statute promises jurisdiction in a court of appeals for those hoping to contest 'a final order of the Commission.' ***But just as plainly, Ms. Cochran does not seek to challenge an SEC final order. Nor could she, because the agency has not entered one in her case.*** Ms. Cochran does not even seek relief in anticipation of a final agency order. Instead, she seeks to avoid being hauled before an agency that she alleges is unconstitutionally structured. . . . That is exactly the kind of 'here-and-now injury' this Court has held 'can be remedied by a court' without regard to the eventual outcome of agency proceedings.

598 U.S. at 210 (Gorsuch, J., concurring) (emphasis added, internal citations omitted). FSMA thus is no different than the statutory schemes reviewed by the Supreme Court in *Axon*. Because DOL has not even entered a final order, let alone a final order that Perdue is challenging here, FSMA does not preclude collateral review.

    **2.**    Count III of Perdue's Complaint asserts the *same* constitutional challenge to the DOL proceedings brought by Watts—the violation of the removal power under Article II's Take Care Clause—that the plaintiffs brought against the FTC and SEC in *Axon*. No material difference in the statutory schemes justifies jurisdiction in *Axon* but not here under FSMA.

    **3.**    Lest there be any doubt, the Supreme Court's reasoning in *Axon*, applying the three-part test for collateral jurisdiction established by the Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), applies with full force: Perdue readily satisfies all three factors.

10

The first factor asks whether precluding district court jurisdiction "could foreclose all meaningful judicial review" of the claim. *Id.* at 212–13. That test is readily met here. The OALJ disclaims any authority even to *consider* constitutional challenges to its jurisdiction (despite acknowledging having authority to address non-constitutional challenges to subject-matter jurisdiction). It even denied Perdue leave to amend its answer to assert constitutional defenses. Perdue thus stands in the same shoes as the plaintiffs in *Axon*: It claims a "'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process" that occurs "irrespective of [the process'] outcome, or of other decisions made within it[,]" analogous to the immunity doctrines establishing "rights 'not to stand trial' or face other legal processes." *Axon*, 598 U.S. at 192 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). As in such cases, Perdue's "rights are 'effectively lost' if review is deferred until after trial." *Id.* Thus, just as the *Axon* plaintiffs would "lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over," *id.*, Perdue similarly would incur substantial harm by having to mount its defense in unconstitutional proceedings. Its "here-and-now" injury is identical.

The second factor, asking whether the claim is "'wholly collateral'" to the administrative review process, *id.* at 186 (quoting *Thunder Basin*, 510 U.S. at 212), is equally clear. Like the *Axon* plaintiffs, Perdue is "challenging the [DOL's] power to proceed at all, rather than actions taken in the agency proceedings," a challenge the Court deems to "qualif[y] as 'collateral.'" *Id.* at 192–93 (citation omitted); *see also id.* at 193 ("Likewise here, both parties object to the Commissions' power generally, not to anything particular about how that power was wielded."). This factor plainly applies here.

The third factor, whether "the claim 'is outside the agency's expertise,'" *id.* at 186 (citation omitted), is not even plausibly disputable. As *Axon* points out, "Agency adjudications are

11

generally ill suited to address structural constitutional challenges." *Id.* at 195. Here, the ALJ flatly declared that Perdue's constitutional challenges are beyond the OALJ's expertise and thus expressly refused even to hear any challenge, going so far as to deny Perdue's motion before it was even filed. If the agency won't even consider the constitutional infirmities, it should not complain about collateral review by an Article III court that has clear authority to decide the issues.

Finally, the theoretical possibility that the agency might avoid the constitutional issues by ruling in Perdue's favor is immaterial. It ignores the "here-and-now" injury that, per *Axon*'s holding, entitles Perdue to an immediate determination of its constitutional challenges before the merits are considered. As *Axon* explains, "ruling for [plaintiffs] on expertise-laden grounds [*i.e.*, the merits] would not 'obviate the need' to address their constitutional claims—which, again, allege injury not from this or that ruling but from subjection to all agency authority. Those claims of here-and-now harm would remain no matter how much expertise could be 'brought to bear' on the other issues these cases involve." *Id.* at 195 (citation omitted). *Axon* controls here.

## II. The DOL Administrative Proceedings Violate Perdue's Right to a Jury Trial under the Seventh Amendment.

Perdue is entitled to summary judgment on Count I, Defendants' violation of its jury-trial right under the Seventh Amendment. No material facts are in dispute; the issues are purely legal.

*Jarkesy II* squarely holds that administrative proceedings to decide parties' private legal rights violate the right to a jury trial under the Seventh Amendment. *See* 603 U.S. at 132, 141. Even in an administrative context, the standard two-part test applies, plus an extremely limited exception: (1) whether Watts' claim has a late-18th century English common-law analogue; (2) much more important, whether his relief sounds primarily in law or equity; and (3) if the two-part test is satisfied because the claim is legal, whether his claim falls within the slim "public rights" exception for the few statutory rights that are so inherently public that Congress may assign them

12

for special treatment by an Article I forum.  *See Jarkesy II*, 603 U.S. at 123, 127.  Like *Axon*, *Jarkesy II* is dispositive.

*Jarkesy II* conclusively proves that the Seventh Amendment governs Watts' plainly legal whistleblower claim.  Compared to the claims at issue in *Jarkesy*, the Seventh Amendment's applicability to Watts' claim is virtually indisputable: Watts seeks compensatory damages for emotional distress and reputational harm, plus lost profits, arising from an alleged breach of his employment contract—quintessential tort and contract remedies that juries have tried for centuries. *See id.* at 123 (calling compensatory damages "the prototypical common law remedy").  No case cited by any party has held that such remedies are equitable and not legal.  *This is not a close call*. In such circumstances, the jury-trial right is inviolate.  *See*, *e.g.*, *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) ("Maintenance of the jury . . . is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.").

As discussed below, Watts' claim clearly satisfies the two-part test, and no public-right exception applies.  Thus, Perdue is entitled to a jury trial, which DOL cannot provide.

> **A.**     **Watts' FSMA Claim Is Analogous to 18th Century Common-Law Claims for Breach of Contract and Tort.**

Watts' retaliation claim under FSMA resembles late 18th-century English common-law breach-of-contract and tort claims for compensatory damages.  It is especially analogous to an 18th century English claim for wrongful termination of an employment contract, as now reflected by modern-day claims for wrongful discharge and breach of an employment contract.  Watts alleges that he was "discharged or otherwise discriminated against" due to activity protected under FSMA. *See* PSUF Appendix 10; 21 U.S.C. § 399d(a), (b).  This claim is no different than routine civil-rights retaliation under 42 U.S.C. § 1981 or other wrongful discharge claims that are obviously

legal, not equitable. *See, e.g., Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254, 266 (5th Cir. 2014) (discussing, in non-Seventh Amendment context, "the common-law background to [an] antiretaliation claim," particularly "wrongful discharge of employment").

The claim plainly resembles an 18th century English common-law action for breach of an employment contract. *See, e.g.*, *Lebow v. Am. Trans Air, Inc.*, 86 F.3d 661, 668 (7th Cir. 1996) ("Lebow's unlawful discharge claim [of retaliation for union organizing prohibited by the Railway Labor Act] is comparable to a common-law action for breach of an employment contract" and is entitled to trial by jury); *Waldrop v. S. Co. Servs., Inc.*, 24 F.3d 152, 156 (11th Cir. 1994) (finding unlawful-discharge claim under Rehabilitation Act analogous to common-law breach-of-contract action). *Lebow* distinguishes 19th century American common law, where employment was at-will, from 18th century English common-law, where employment rights were enforceable:

> [U]nlike nineteenth-century American law, under which employees served at the will of their employers, the common law presumed that a contract existed between employers and employees. . . . Under British common law, if there was no contract specifying a term of employment, 'the law construe[d] it to be a hiring for a year.' . . . Employment by contract was the rule in eighteenth-century England, so an improper discharge would have been viewed as a breach of contract. Thus, Lebow's unlawful discharge claim is comparable to a common-law action for breach of an employment contract.

86 F.3d at 668 (multiple internal citations omitted).

The claim also sounds in tort. *See id.* (ruling that retaliation/wrongful discharge is "similar to a common-law tort"). Statutory civil-rights claims for discrimination are triable by jury under the Seventh Amendment because they are statutory torts, even though discrimination was not actionable in the 18th century. *See, e.g.*, *Curtis v. Loether*, 415 U.S. 189, 195 (1974) (affirming jury-trial right for fair-housing discrimination claim under Title VIII, reasoning that "[a] damages action under the statute sounds basically in tort," and recognizing that the claim "is analogous to a number of tort actions recognized at common law"); *see also City of Monterey v. Del Monte Dunes*

14

*at Monterey, Ltd.*, 526 U.S. 687, 709-10 (1999) (holding that § 1983 is "an action at law" subject to the Seventh Amendment because it "provides relief for invasions of rights protected under federal law" and thus "'creates a species of tort liability'") (citations omitted). Generally, "[r]etaliatory discharge [is] treated as an intentional tort." *Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187, 1192 (1st Cir. 1994). Thus, absent a statutory provision disclaiming legal status, as courts have held to be true for Title VII, a federal statutory claim for monetary damages caused by the violation of a legal duty imposed by statute should be treated as a tort, irrespective of its novel statutory nature. At the very least, wrongful discharge or failure-to-hire statutory claims often are viewed as sounding in both law and equity, with concurrent jurisdiction in both, making the legal nature of the requested remedies even more pivotal. *See, e.g.*, *Isrealitt v. Enter. Servs. LLC*, 78 F.4th 647, 658 (4th Cir. 2023) (ADA); *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 828–29, 832 (4th Cir. 1994) (Rehabilitation Act). FSMA antiretaliation claims are analogous.

In either case, the fact that Watts' retaliation claim under FSMA arises through a statutory scheme requiring an initial filing in an administrative agency is immaterial. "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency[.]" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61 (1989) (requiring a jury trial for fraudulent conveyance claims brought in U.S. Bankruptcy Court). What matters is that Watts' FMSA claim has common-law analogues sounding in contract and tort, meeting the first *Jarkesy* element.

B.      **Watts Seeks Compensatory Damages and Other Legal Relief.**

The second prong of the test, whether Watts' requested relief is legal or equitable, is much "'more important.'" *Jarkesy II*, 603 U.S. at 123 (citation omitted). And here, almost all of Watts' requested remedies are legal in nature, a fact that, as in *Jarkesy II*, "is all but dispositive." *Id.*

15

First, Watts' supplemental complaint in the DOL proceedings seeks "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and [] damage to his reputation." (PSUF Appendix Ex. 10, ¶ 81). Damages for emotional distress, lost enjoyment of life, and reputational harm are quintessential legal compensatory damages, no different from those available in tort. They are triable by jury under settled Seventh Amendment jurisprudence. *See, e.g.*, *Jarkesy II*, 603 U.S. at 123 ("While monetary relief can be legal or equitable, money damages are the prototypical common law remedy."); *Wooddell v. IBEW, Loc. 71*, 502 U.S. 93, 98 (1991) ("A personal injury action is of course a prototypical example of an action at law, to which the Seventh Amendment applies."); *Ross v. Bernhard*, 396 U.S. 531, 533 (1970) ("The Seventh Amendment . . . entitle[s] the parties to a jury trial in actions for damages to a person or property[.]"). Here, "what [Watts and Howell] in fact seek is nothing other than compensatory *damages*[,]" which are not "a remedy traditionally viewed as 'equitable,' such as injunction or restitution"; rather, "[m]oney damages are, of course, the classic form of *legal* relief." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255 (1993). This claim arises from FSMA itself, which allows a court to award "compensation for any special damages," 21 U.S.C. § 399d(b)(4)(B)(iii), a term that courts have held to allow emotional-distress and reputational-harm damages in other whistleblower protection schemes.[1]

DOL has pointed to language in *Jarkesy II* that damages to "restore the status quo" are equitable and that legal remedies are punitive in nature, *see* 603 U.S. at 123, but those statements

---

[1] *See, e.g.*, *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 672 (4th Cir. 2015) (finding that "compensation for special damages" in the Sarbanes-Oxley whistleblower protections includes emotional distress); *Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 893 (8th Cir. 2000) (finding facts sufficient for jury trial of alleged emotional distress under False Claims Act's provision for "special damages" in similar statutory scheme of whistleblower protections).

merely describe and contrast the statutory penalties at issue in the case. *Jarkesy II* elsewhere states that compensatory damages are legal, and of course their very purpose is to make plaintiffs whole. *See City of Monterey*, 526 U.S. at 710-11 (1999) (affirming that "compensation is a purpose 'traditionally associated with legal relief'" subject to the Seventh Amendment) (quoting *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998)).  Equitable remedies that "restore the status quo," *Jarkesy II*, 603 U.S. at 123, come into play only when legal remedies do not suffice and require disgorgement or restitution.  *See, e.g.*, *Rose v. PSA Airlines*, 80 F.4th 488, 496, 499 (4th Cir. 2023) (holding that "compensatory damages intended to provide 'monetary relief for all losses' . . . are legal, not equitable, relief," while damages to disgorge profit or prevent unjust enrichment, *e.g.*, returning "property (funds) that the defendant wrongfully possessed and that rightfully belonged to the plaintiff," are equitable (citation omitted)).

Second, Watts' request for "compensatory damages" to his business due to lost income, incurred expenses from delayed placement of flocks, and extra salary cost for an employee, (PSUF Appendix Ex. 10 ¶ 82), is the equivalent of a claim for lost profits.  Lost profits are a legal remedy. *See Mertens*, 508 U.S. at 255 (holding that "monetary relief for all losses . . . sustained" is "the classic form of *legal* relief"); *Goettsch v. Goettsch*, 29 F. Supp. 3d 1231, 1242 (N.D. Iowa 2014) (finding compensatory damages are legal in nature when they focus on "plaintiffs' perceived losses and harm"); *Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 642–43 (S.D.N.Y. 2005) (requiring a jury trial because "claims sought compensation in the form of damages under the legal remedy of lost profits," but noting that remedy was no longer available due to discovery failures), *aff'd*, 469 F.3d 284 (2d Cir. 2006).

Third, Watts seeks backpay in the form of "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with

Perdue." (PSUF Appendix Ex. 10 ¶ 80). A claim for lost earnings and compensation is legal, not equitable, where it is "but a freestanding claim for money damages," and does not seek a discrete pool of funds held by defendant that "belong to" plaintiff. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214, 218 n.4 (2002); s*ee also Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) ("As an action on a debt allegedly due under a contract, it would be difficult to conceive of an action of a more traditionally legal character."); *Rose*, 80 F.4th at 504 ("[S]eek[ing] 'merely personal liability upon the defendants to pay a sum of money' ask[s] for legal, not equitable, relief[.]"). Backpay typically is considered legal, not equitable. *See, e.g., Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 573 (1990) ("[T]he remedy of backpay sought in this duty of fair representation action is legal in nature."); *Woodell*, 592 U.S. 97–98 (holding that a Labor Management Reporting and Disclosure Act "claim for lost wages cannot be treated as restitutionary incident to an order reinstating him"); *Waldrop v. S. Co. Servs.*, 24 F.3d 152, 157 (11th Cir. 1994) (noting that "the recent trend of Supreme Court cases is to treat back pay awards as legal remedies"); *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 832–33 (4th Cir. 1994) (recognizing a jury-trial right because "an award in the amount of backpay" under the Rehabilitation Act "would not be characterized as an equitable remedy"); *Pons v. Lorillard*, 549 F.2d 950, 954 (4th Cir. 1977) ("[A] monetary award for back wages is a traditional legal remedy" for an ADEA violation), *aff'd*, 434 U.S. 575 (1978); *Eichorn v. AT&T Corp.*, 484 F.3d 644, 656 (3d Cir. 2007) ("The remedy they seek is thus akin to 'back pay,' which is not an equitable remedy within the meaning of [ERISA]. . . . 'Back pay claims do not differ remedially from the personal injury claim for lost wages, or the contract claim for past wages . . . .'" (citation omitted)); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 965 (9th Cir. 2002) (explaining that Family Medical Leave Act backpay is a legal remedy).

In sum, most of Watts' remedies are legal in nature, meeting the second, "more important" prong of the Seventh Amendment's test for the right to trial by jury.

### C. The Public-Rights Exception Does Not Apply.

*Jarkesy II* effectively shuts the door for the narrow exception for legal claims that advance a "public right." *See* 603 U.S. at 128 ("If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory"). If the rights at issue are private, *i.e.*, they involve claims commonly litigated by private parties, the exception does not apply. Watts is a private party; his claims involve a dispute over a contract with a private party; and he seeks remedies that are personal to him without any financial benefit to the public. His claims are quintessentially private.

Where, as here, the government is not directly involved as a party in the dispute, the public-rights exception applies only if the underlying claim is "closely intertwined" with the regulatory scheme. *Id.* at 133-34. That test asks whether the claim is *inextricable* with the regulatory scheme or whether it can be severed and considered independently by an Article III court: a claim is not "closely intertwined" with a regulatory program if it can be brought as a "standalone suit[]" in federal court. *Id.* at 134. That is precisely the situation here because FSMA allows whistleblowers to kickout the case to federal court if a decision is not rendered within 210 days of filing or, again, "within 90 days *after* receiving a written determination" by DOL. 21 U.S.C. § 399d(b)(4)(A). Equally crucial, if a FSMA complainant elects to proceed in federal court, *either party may elect a jury trial*. *Id.* "Congress ha[s] already authorized jury trials" for Watts' claim, "demonstrating that jury trials [a]re not generally 'incompatible' with the overall regime." *Jarkesy II*, 603 U.S. at 134. Thus, Congress itself has determined that Watts' whistleblower rights and remedies need not be heard by DOL. That fact alone should settle the question. Congress has spoken.

*Jarkesy II*'s analysis of the SEC statutory scheme affirms that the exception does not apply. There, not even the SEC's dual role as prosecutor *and* decisionmaker in adjudicating securities fraud triggered the public-rights exception. *See id.* at 140. If SEC-brought securities-fraud claims do not implicate public rights, then surely Watts' claims seeking personal compensation for emotional distress are not "public rights," either. The fact that he seeks compensation for an alleged whistleblower violation is immaterial. The "clear focus" of FSMA's damages remedy for whistleblowers is "on *regulating employment relationships*" governed by contract, not food safety. *See Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 127 (D.C. Cir. 2022) (discussing purpose of analogous Sarbanes-Oxley antiretaliation provision).

## III. The DOL Administrative Proceedings Violate Perdue's Right to Adjudicate Watts' Claim in an Article III Court.

Perdue is entitled to summary judgment on Count II, Defendants' violation of its right to adjudicate in an Article III court. No material facts are in dispute; the issues are purely legal.

Adjudicating Watts' claim administratively in the DOL violates Article III, where judicial power is solely vested, by using an Article I tribunal to adjudicate private rights. The Constitution requires "'the judicial power of the United States'" to be vested in Article III courts, and Congress may not confer judicial power "on entities outside Article III." *Stern v. Marshall*, 564 U.S. 462, 469, 483-84 (2011) (cleaned up). Pursuant to this limitation, "cases involving private rights . . . may not" be removed from Article III courts. *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 32 (2014). Watts' claim against Perdue for damages involves private rights. *See Axon*, 598 U.S. at 204 (Thomas, J., concurring) (explaining that lawsuits seeking money damages "implicate the core private right to property" and belong in an Article III court, not an Article I administrative tribunal). The DOL proceedings usurp the exclusive jurisdiction of Article III tribunals.

20

This is not a technicality. DOL's adjudicatory process does not substitute for the fairness and procedural rigor of an Article III court. The Seventh Amendment "does not work alone," but rather "operates together with Article III and the Due Process Clause of the Fifth Amendment" to "vindicate the Constitution's promise of a 'fair trial in a fair tribunal.'" *Jarkesy II*, 603 U.S. at 141 (Gorsuch, J., concurring) (citation omitted). "Article III entitles individuals to an independent judge who will preside over that trial." *Id.* Here, DOL acts as judge and jury, and may act as prosecutor. FSMA thus runs afoul of the Constitution by "withdrawing the matter from judicial cognizance and handing it over to the Executive Branch for an in-house trial." *Id.* at 151 (cleaned up). The fact that this action "originated in a newly fashioned regulatory scheme [does not] permit Congress to siphon [it] away from an Article III court." *Id.* at 135 (majority op.) (cleaned up).

## IV. DOL ALJs Violate the Presidential Removal Power of Article II.

Perdue is entitled to summary judgment on Count III, the violation of the removal power of Article II's Take Care Clause. No material facts are in dispute; the issues are purely legal.

Article II provides that the President must "take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3, vesting the President with sole "authority to remove those who assist him." *Free Enter. Fund*, 561 U.S. at 513-14. Dual-layer removal protection violates that provision. The President may not be "restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer, even though that inferior officer determines the policy and enforces the laws of the United States[.]" *Id.* at 484. "[S]uch multilevel protection from removal is contrary to Article II's vesting of the executive power in the President." *Id.*

Here, the OALJ's ALJs are unconstitutionally shielded from presidential oversight for two reasons. First, they are inferior executive officers. *See Lucia v. SEC*, 585 U.S. 237, 247–51 (2018) (SEC ALJs are inferior officers under the Appointments Clause); *Jarkesy I*, 34 F.4th at 463 (same for removal power); *ABM Indus. Grps., LLC v. DOL*, ___ F. Supp. 3d ___, 2024 WL 4642962, at

*4 (S.D. Tex. 2024) (applying *Jarkesy I* to DOL ALJs). Second, DOL ALJs are doubly insulated from the presidential removal power: They can be removed *only* for cause and *only* by the Merit Systems Protection Board ("MSPB"), whose members can be removed *only* for cause by the President. Specifically, the Secretary of Labor may remove the ALJ "only for good cause established and determined by the [MSPB] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). MSPB members may be removed by the President only for cause, *i.e.*, they "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). This double layer of for-cause removal protection violates the Take Care Clause, which vests the removal power with "the President alone." *Seila*, 591 U.S. at 213. Under Article II, the President must have "authority to remove those who assist him in carrying out his duties," and, although one layer of insulation from Presidential power is acceptable, two layers are not. *Free Enter. Fund*, 561 U.S. at 513–14. In reviewing this structure, the Fourth Circuit has acknowledged that "Congress has insulated [DOL ALJs] from the President's removal authority by two layers of for-cause tenure protection[.]" *K & R Contractors LLC v. Keene*, 86 F.4th 135, 148 (4th Cir. 2023).

*Jarkesy I* held that double insulation of SEC ALJs is unconstitutional, reflecting a Circuit split. *Compare Jarkesy I*, 34 F.4th at 463–65, *and Fleming v. USDA*, 987 F.3d 1093, 1123 (D.C. Cir. 2021) (Rao, J., concurring in part and dissenting in part), *with Leachco, Inc. v. CPSC*, 103 F.4th 748, 764 (10th Cir. 2024), *and Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1136 (9th Cir. 2021). In *K & R*, the Fourth Circuit declined to take a position on constitutionality, ruling instead that any violation of the removal power did not cause injury ("compensable harm") sufficient to warrant vacating of an ALJ's decision already made. *K & R*, 86 F.4th at 149. Both *K & R* and *Collins v. Yellen*, 594 U.S. 220 (2021), view harm as a predicate to vacating unlawful acts *already*

*completed* by the official.  *See Collins*, 594 U.S. at 257 (holding that, despite unconstitutional removal restriction, decision could not be declared void *ab initio* absent actual harm); *K & R*, 86 F.4th at 149 ("*Collins* instructs that a party who has successfully challenged an unconstitutional removal restriction is not entitled to have the *underlying agency action set aside* absent reason to believe that the unconstitutional removal provision itself inflicted harm." (emphasis added)).

By contrast, most non-vacatur cases grant relief to address removal violations.  *See Seila*, 591 U.S. at 213–32 (declaring removal protection unconstitutional without addressing harm); *Free Enter. Fund*, 561 U.S. at 513 (holding petitioners were "entitled to declaratory relief" because unconstitutional proceeding inflicted "a 'here-and-now' injury that can be remedied by a court" (cleaned up)); *Cochran v. SEC*, 20 F.4th 194, 210 n.16 (5th Cir. 2021) (en banc) (pointing out that plaintiff "does not seek to 'void' the acts of [the ALJ].  Rather, she seeks an administrative adjudication untainted by separation-of-powers violations.").  Given *Axon*'s holding of a "here-and-now" injury from proceeding before ALJs in violation of the Take Care Clause, *Axon* confirms that *Keene* should not apply.[2]  Perdue's here-and-now injury is acute and palpable: ALJ Kultgen refused to consider Perdue's constitutional challenges, rejected Perdue's request to issue subpoenas to third parties, and even denied Perdue's motion for leave to amend to assert constitutional defenses and request a jury trial.  The removal-power violation thus is actionable and ripe for decision by this Court.

---

[2] The Supreme Court has long recognized that violations of separation of powers regarding a removal power constitute actionable "here-and-now" injuries because they create an unnatural imbalance that affects (taints) the decision-making of the official whose decisions are at issue.  *See Seila*, 591 U.S. at 212 (discussing cases); *Browsher v. Synar*, 478 U.S. 714, 727 n.5 (1986) (explaining that unconstitutional vesting in Congress of power to remove the Comptroller General is a here-and-now injury even if the power has not yet been exercised).

**V.      The DOL Proceedings Violate the Nondelegation Doctrine.**

Perdue is entitled to summary judgment on Count IV, the violation of the nondelegation doctrine, because FSMA delegates Congress' legislative power under Article I of the Constitution to a private litigant.  No material facts are in dispute; the issues are purely legal.

Under the nondelegation doctrine, Congress may not delegate its legislative power to a non-legislative party to determine whether a matter belongs in an Article I or Article III court without providing an "intelligible principle" to guide the exercise of that power.  *See Jarkesy I*, 34 F.4th at 459, 462–63 (citing *Mistretta v. United States*, 488 U.S. 361, 372 (1989)); *see also Crowell v. Benson*, 285 U.S. 22, 50 (1932) (stating that the assignment of cases to administrative tribunals is a core legislative decision "completely within congressional control").  FSMA provides no such "intelligible principle" and instead accords Watts, *a private litigant*, the unilateral, plenary, and unfettered power to decide whether to keep his claim in an Article I agency—or whether to kickout to an Article III court with attendant due-process protections such as third-party subpoena power, the Federal Rules of Evidence, and the right to a jury trial.  FSMA accords Watts this unilateral kickout power *twice*, first after OSHA does not reach a final decision on his claims within 210 days of his initial filing, and again "within 90 days after receiving a written determination" by the Secretary.  21 U.S.C. § 399d(b)(4)(A).  And it grants Watts this power without conferring the same discretion on his adversary, Perdue.  Congress failed to provide any intelligible principle on how Watts should exercise his discretion.  By delegating to a *private* third party (Watts), the power to choose (twice, at separate junctures) whether to move his claims to an Article III court, Congress exceeded its Article I power.

*Jarkesy I* held that Congress impermissibly delegated to the SEC "unfettered authority to choose whether to bring enforcement actions in Article III courts or within the agency."  34 F.4th at 459.  By giving this authority to a private party, FSMA more egregiously violates the

nondelegation doctrine than did the securities laws at issue in *Jarkesy*, where the delegee was a government agency (the SEC). "[I]t is a central tenet of liberty" that Congress "may not empower a private entity to exercise unchecked legislative or executive power," and, "at a minimum, a private entity must be subordinate to a federal actor in order to withstand a delegation challenge." *Oklahoma v. United States*, 62 F.4th 221, 228–29 (6th Cir. 2023). Private delegation "represent[s] 'legislative delegation in its most obnoxious form.'" *Pittston Co. v United States*, 368 F.3d 385, 394 (4th Cir. 2004) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). This is especially so where the delegation favors one private party to the disadvantage of another. *See id.* ("Any delegation of regulatory authority 'to private persons whose interests may be and often are adverse to the interests of others in the same business' is disfavored.") (quoting *Carter Coal*, 298 U.S. at 311).

It is difficult to imagine a more unfair advantage than allowing the party seeking millions of dollars in damages to select whether his arbiter will be a jury or an ALJ; whether his adversary may seek discovery from his principal source(s) of evidence; whether a presiding officer meets constitutional qualifications and has Article III powers; and whether the agency hearing the matter has the right to participate as prosecutor. It is even more remarkable that FSMA accords that party the same option again, *after* a written determination by the Secretary, effectively giving him, but not his adversary, the right to wipe out an adverse Article I ruling and redo the claim *de novo* in an Article III court. The lack of any intelligible principle to guide this unfettered discretion violates separation of powers under the basic strictures of the nondelegation doctrine. *See Oklahoma*, 62 F.4th at 228 ("Precedent confirms that unchecked delegation to private entities at a minimum violate core separation-of-power guarantees.").

## VI. The DOL Proceedings Violate Due Process.

Finally, Perdue is entitled to summary judgment on Count V, DOL's violations of the Fifth Amendment's Due Process Clause. No material facts are in dispute; the issues are purely legal.

To begin, the ALJ ruled that she lacks statutory power to issue third-party subpoenas Purdue needs to investigate Watts' key evidence: the video footage filmed on Watts' farm lying at the heart of Watts' retaliation claim. That order denied Perdue basic discovery regarding the preparation and production of the pivotal element in Watts' claim. Due process is denied when an ALJ relies upon evidence as the basis for decision yet denies a request to subpoena directly related documents or testimony. *See Souch v. Califano*, 599 F.2d 577, 580 (4th Cir. 1979) (holding that an ALJ's failure to issue a subpoena for testimony and documents underlying key adverse evidence violates due process). Whether the ALJ is correct about her limited power is not the issue; any inability to issue vital third-party subpoenas facially violates due process by materially impairing Perdue's ability to defend itself.

The lack of subpoena power compounds other disparities. DOL ALJs have broad discretion to limit discovery and allow evidence outside of the Federal Rules of Evidence. *See* 29 C.F.R. § 1987.107(b), (d) ("Formal rules of evidence will not apply."). Both the ALJ and the ARB have full power to waive any rule or regulation governing their respective proceedings merely upon a finding of good cause or "special circumstances not contemplated" by the regulations— which are undefined and thus unbounded. 29 C.F.R. § 1987.115. The ALJ has ruled that she lacks authority to consider constitutional questions concerning subject-matter jurisdiction, in stark contrast to an Article III court's inherent judicial authority to determine whether Article II officers violate the Constitution, a power "of the very essence of judicial duty." *Marbury v. Madison*, 5 U.S. 137, 178 (1803). Requiring years of illegitimate unconstitutional litigation because the tribunal claims to lack power to halt it is the epitome of unfairness.

26

These disparities are compounded by OSHA's power to join the case and dually serve as litigant/prosecutor and adjudicator/ultimate decisionmaker. *See* 29 C.F.R. § 1987.108(a)(1) (OSHA may "participate as a party or as amicus curiae at any time at any stage of the proceeding," including a petition for review of an ALJ decision or an ALJ's decision on a settlement). Though combining roles as investigator and adjudicator does not facially or necessarily violate due process, "the issue is substantial" and should be carefully assessed in context. *See Withrow v. Larkin*, 421 U.S. 35, 51 (1975).

Worst of all, FSMA violates due process by vesting complainants, but not respondents, the right to move the action to federal court and proceed *de novo*, even after a written determination by the Secretary. 21 U.S.C. § 399d(b)(4)(A). Only Watts, and not Perdue, gets to decide whether to utilize the unfair advantages provided him under FSMA by proceeding in the DOL, or to take a second bite in an Article III court if the administrative proceedings do not play out to his liking. Due process requires a level playing field. *See, e.g.*, *N.Y. St. Inspection, Sec. & L. Enf't Emps., Dist. Council 82 v. N.Y. St. Pub. Emp. Rels. Bd.*, 629 F. Supp. 33, 48 (N.D.N.Y. 1984) (ruling that the practice of giving "unfair advantage on the part of one party … 'must be forbidden if the guarantee of due process is to be adequately implemented'") (quoting *Withrow*, 421 U.S. at 47).

DOL's FSMA process forces respondents to surmount a steep one-sided incline to defeat whistleblower allegations. This manifestly unfair, unleveled playing field violates due process.

**VII.    Perdue Is Entitled to a Permanent Injunction.**

For the foregoing reasons, the DOL proceedings are unconstitutional in one or more ways. Because this constitutes "actual success" on Perdue's claims, and because Perdue will suffer an irreparable injury if the proceedings are not enjoined, no remedies at law are available, and the balance of hardships and public interest weigh in Perdue's favor, a permanent injunction should issue. *Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020).

27

First, Perdue will suffer immediate and irreparable harm absent injunctive relief. *See Axon*, 598 U.S. at 191 ("[B]eing subjected to unconstitutional agency authority ... by an unaccountable ALJ ... is a here-and-now injury" that is "***impossible to remedy once the proceeding is over, which is when appellate review kicks in***." (internal quotation marks omitted, emphasis added)). An appellate court "could of course vacate the [agency]'s order[,] [b]ut [a] separation-of-powers claim is not about that order; indeed, [Perdue] would have the same claim[s] [if] it won before the agency." *Id.* As in *Axon*, Perdue's claims here are "about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker. And as to that grievance, the court of appeals can do nothing: A proceeding that has already happened cannot be undone." *Id.* "[J]udicial review of [Perdue's] structural constitutional claims would thus come too late to be meaningful." *Id.* at 175. *Axon* thus establishes that Perdue faces irreparable harm if the proceedings are not enjoined. This result reflects the black-letter rule that *any* deprivation of constitutional rights, "for even minimal periods of time, constitutes irreparable injury" warranting injunctive relief. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Second, the balance of the equities and the public interest are satisfied because Defendants are not harmed by an injunction that "prevents [them] from" using an unconstitutional adjudication process, and "the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (preliminary injunction); *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."). Conversely, an injunction would not cause substantial harm to others because, "[i]f anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

Nor would Watts be prejudiced.  He can kickout his whistleblower claims to federal court, as ALJ Kultgen invited him to do.  Discovery already underway will carry over.

No remedy short of an injunction will prevent the constitutional violations.  Perdue is entitled to an injunction halting any further constitutional violations.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Perdue's motion for summary judgment and enter an injunction halting the DOL proceedings.

Dated: February 19, 2025

Respectfully submitted,

/s/ Margaret Santen

Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600
Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

Roger A. Colaizzi (special appearance)
Kristin M. Koger (special appearance)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (special appearance)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*