UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-cv-00477-BO

**PERDUE FARMS INC.**,

   Plaintiff,

v.

**LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the United States Department of Labor, *et al.*,

   Defendants.

# DEFENDANT CRAIG WATTS LOCAL RULE 56.1(a) RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), Defendant Watts respectfully submits this response to Plaintiff's statement of material facts, ECF No. 50.

 1. Defendant Craig Watts is a poultry farmer who owns and operates C&A Farms in Fairmont, North Carolina. (Appendix, Ex. 1, Whistleblower Compl., ¶ 3 (Feb. 23, 2015)).

 **RESPONSE**: Undisputed.

 2. Plaintiff Perdue is an integrated poultry producer engaged in business throughout the United States, including North Carolina. *See Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 683-84 (E.D.N.C. 1985) (explaining Perdue's business model); *see also* (Compl. ¶ 22, ECF No. 6; Watts Answer ¶ 22, ECF No. 25).

 **RESPONSE**: Undisputed.

 3. In the administrative proceedings and related judicial review, Perdue alleged that, under this business model for its integrated operation, Perdue owns hatcheries and breeding

flocks; it delivers its chicks to independent contract growers, such as Watts. (Compl. ¶ 22, ECF No. 6; Watts Answer ¶ 22, ECF No. 25). The growers provide the land, facilities, equipment, and labor to raise the chicks over the course of approximately six to eight weeks, after which Perdue removes the birds from the grower's farm for processing. *Id*.

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review.

4. Watts raised chickens for Perdue under a standard written contract (the "Agreement"). (Compl. ¶ 23, ECF No. 6; Watts Answer ¶ 23, ECF No. 25). Watts raised chicks for Perdue subject to and in accordance with applicable federal law and United States Department of Agriculture ("USDA") regulations. *See id*.; 9 C.F.R. § 201.100 (USDA regulations governing poultry growing agreements). The Agreement thus imposed upon Watts extensive requirements to protect the well-being of the poultry. (Compl. ¶ 23).

**RESPONSE**: The first sentence is undisputed. The second and third sentences speak to a question of law (namely, what federal laws and regulations Perdue and Watts were "subject to," and the nature of the obligations imposed by those requirements) instead of statements of fact, and are therefore inappropriately included in the Statement of Material Facts.

5. Watts' Agreement with Perdue renewed with each subsequent flock, and either party had the authority to terminate the agreement with ninety-days' notice. (Compl. ¶ 24, ECF No. 6; Watts Answer ¶ 24, ECF No. 25). In exchange, Watts agreed to feed, water, and care for the consigned chicks until they were removed by Perdue. *Id.* Typically, chicks would be raised by contractor farmers for several weeks before removal. (Appendix, Ex. 1, Whistleblower Compl. ¶ 4).

**RESPONSE**: Undisputed.

6. For years, Watts complained about the amount and system of compensation to

which he agreed to accept in his contract with Perdue, to no avail. (Compl. ¶ 25, ECF No. 6; Watts Answer ¶ 25, ECF No. 25; Appendix, Ex. 22, Colaizzi Decl. ¶ 3).

   **RESPONSE**: Undisputed.

   7. In May 2014, Mr. Watts, working with a cinematography group and at least one third-party activist group, invited to his farm a film crew from a private third-party organization to film a group of live chicks that were recently placed on his farm by Perdue. (Appendix Ex. 1, Whistleblower Compl. ¶¶ 29, 30). Several weeks later, the private third-party organization returned to his poultry farm to film more footage of the flock, which was then nearing the end of its growth cycle. *Id.* at ¶ 30. Watts alleged that the chickens in his care were in deplorable condition, *id.* at ¶ 33, describing them as "panting and trampling each other to move around" and "laying in their own litter and feces, unable to move, with large red, irritated patches of flesh across their breasts." *Id*. at ¶ 38. He alleged that the condition of his chickens showed they were not "Humanely Raised," as Perdue had indicated on product labels and in advertising for a brand. *Id.* at ¶¶ 31–32. The third-party then allegedly edited the footage into a short video and released it on its website. *See id.* at ¶ 31. The video received coverage in national news media. *Id.* at ¶¶ 32, 35.

   **RESPONSE**: Undisputed.

   8. Perdue, in turn, alleged in the DOL proceedings that the video demonstrates that Watts had failed to comply with his contractual biosecurity and animal welfare responsibilities in raising the chicks. (Appendix, Ex. 22, Colaizzi Decl. ¶ 4). For example, rather than euthanize sick and injured chickens in his flock as was his obligation, Watts kept some of them alive, despite manifest suffering of multiple chicks from incurable deformities. *Id.* The video showed chickens in considerable heat distress, but Watts' ventilation fans were not operating. *Id.* Not only had Watts disregarded the chickens' welfare, but, Perdue alleged, he also had violated the

"biosecurity" protocols designed to prevent the proliferation of infectious diseases in poultry flocks. *Id.*

RESPONSE: Undisputed that Perdue alleged in the administrative proceedings these claims that Watts did not fulfill his biosecurity and animal welfare responsibilities in raising the chicks. Watts denied these allegations.

9. In the DOL proceedings and related judicial review, Perdue alleged that, upon viewing the video, Perdue sent its Poultry Welfare auditors to Watts' poultry farm to ascertain the condition of the flock. (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 7). Moreover, a non-profit, third- party entity comprised of animal welfare experts also reviewed the video and prepared a report that concluded that Watts was responsible for the substandard conditions in his chicken houses on the video. *Id.*

RESPONSE: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review and further alleged there was a "non-profit third-party" entity of "animal welfare experts" who reviewed the video and prepared said report. Watts disputed these allegations in the administrative proceedings and related judicial review.

10. Relying largely on this report, on December 29, 2014, Perdue wrote a letter to Watts advising him that it had concluded that he needed to complete supplemental biosecurity and animal welfare training prior to the placement of a new flock, in order to prevent further poultry welfare and biosecurity violations. *Id.*; *see also* Appendix Ex. 1, Whistleblower Compl. ¶¶ 37-39.

RESPONSE: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review, but incomplete. Perdue has alleged it relied largely on this report to write said letter. Watts disputed the report was what Perdue relied upon; instead Watts alleged

retaliation was Perdue's motivation. Watts has also alleged that Perdue's letter stated that it was "implementing a Performance Improvement Plan for poultry welfare and biosecurity" on Watts' farm, including that Perdue would be "auditing" Watts' chicken houses and "would send agents to perform frequent, unannounced checks following placement of the next flock," in addition to the training requirement. Pl.'s Appendix Ex. 1, Whistleblower Compl. ¶¶ 37-39, ECF No. 51-1.

11. On February 23, 2015, Watts filed a whistleblower complaint in OSHA against Perdue alleging violations of FSMA's employee-protection provisions through purported retaliation by Perdue for his involvement in the video. (Appendix, Ex. 1, Whistleblower Compl.). Watts argued that Perdue's labeling of chicken as "Humanely Raised" was misleading because he did not raise them humanely on his farm. *Id.* at ¶¶ 20, 52. He further claimed that he was subjected to adverse employment actions, including increased scrutiny of operations, additional training prior to the placement of Perdue's next flock, a delay in the placement of his flock, and implementation of a Performance Improvement Program. *Id.* at ¶¶ 1, 36-43. The complaint sought "compensatory damages for lost earnings resulting from the delayed placement of his most recent flock by [Perdue], and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014[,]" plus "all other relief available at law and equity." *Id.* at ¶¶ 58, 61.

**RESPONSE**: Undisputed that Perdue alleged as much in the administrative proceedings and related judicial review, but incomplete. Disputed as to "Watts argued" as Watts did not argue that Perdue's labeling of chicken as "Humanely Raised" was misleading because *he* did not raise them humanely on his farm. Watts' complaint also sought injunctive "expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan," as well as "an order prohibiting [Perdue] from continuing to subject his facility to retaliatory increased

inspections." Pl.'s Appendix Ex. 1, Whistleblower Compl. ¶¶ 59-60.

12. On February 8, 2016, an OSHA regional investigator found that Watts was not an employee of Perdue, and the complaint was dismissed. (Appendix, Ex. 3, Secretary's Findings, Report of Investigation and Complaint). Watts appealed to the OALJ, and Perdue moved to dismiss, arguing that DOL lacked subject-matter jurisdiction because Watts' claims that Perdue fails to raise chickens humanely as advertised arise under the Poultry Product Inspections Act ("PPIA"), 21 U.S.C. § 451 et seq., a statute enforced by USDA, not FSMA, which generally is enforced by the U.S. Food and Drug Administration ("FDA"). (Appendix, Ex. 2, Perdue Opp. to DOL Motion for Voluntary Remand at 9). On January 6, 2017, a DOL ALJ agreed and dismissed Watts' complaint. (Appendix, Ex. 4, ALJ's Decision and Order Granting Respondent's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Jan. 6, 2017). Watts appealed to DOL's Administrative Review Board ("ARB"), which affirmed on March 5, 2019. (Appendix, Ex. 5, ARB Decision). Watts appealed to the Fourth Circuit, but, before briefing, DOL moved for voluntary remand to the ARB for the limited purpose of permitting the FDA to file an amicus brief. (Appendix, Ex. 6, DOL Mot. for Voluntary Remand (Sept. 24, 2019)). The Fourth Circuit granted the request summarily and remanded to the ARB on January 7, 2020. (Appendix, Ex. 7, Order Granting Mot. for Remand).

**RESPONSE**: Undisputed.

13. Before the ARB, FDA principally argued that live "poultry" raised on farms was "food" under the FDCA for all purposes, including issues concerning conditions under which the poultry was raised. (Appendix, Ex. 8, FDA Amicus Br. 5–12 (Mar. 11, 2020)). At the end of its brief, the FDA asserted that, because "animal food is food," and because Perdue supplied Watts with animal food, this was an "independent" point that "may be relevant to the [ARB's]

evaluation" of subject matter jurisdiction, *id.* at 23, 25, even though none of Watts' claims concerned chicken feed supplied by Perdue. On December 6, 2020, the ARB agreed with FDA's tail-end suggestion and remanded to the OALJ, ruling that, because Perdue "supplied the poultry animal feed for poultry on Watts' farm[,]" Perdue distributes food under FSMA "and thus is a covered entity." (Appendix, Ex. 9, ARB Decision at 6).

**RESPONSE**: As to the first sentence, it is undisputed that FDA argued that live poultry intended for use as food is "food" within the meaning of the FDCA. The second sentence is undisputed but incomplete and misleading. FDA's argument that animal feed is food was not a "tail-end suggestion," but a separate section in FDA's amicus brief that encompassed over two pages. *See* Pl.'s Appendix Ex. 8 at 23-25, ECF No. 51-8. The third sentence is undisputed but incomplete. The ARB decision stated that "[t]he question before the Board is whether Perdue is an 'entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food.' 21 U.S.C. § 321(f). FDA argues and Perdue does not dispute that Perdue supplied the poultry animal feed for poultry on Watts's farm. Accordingly, Perdue is an entity who manufactures, process, transports, or distributes 'food' within the meaning of the Act and thus is a covered entity." Pl.'s Appendix Ex. 9 at 6, ECF No. 51-9.

14. Perdue moved to dismiss in the OALJ on January 29, 2021, which remained pending through April 21, 2022, when the case was reassigned to ALJ Pamela Kultgen. (Appendix, Ex. 22, Colaizzi Decl. ¶ 5). Watts never sought to revive the dormant proceedings until he filed a supplemental complaint on April 25, 2022. *Id*.

**RESPONSE**: The first sentence is undisputed. As to the second sentence, it is undisputed that nothing new was filed in the administrative proceedings while the parties waited for an ALJ to resolve the motion to dismiss, but disputed as to Watts 'never sought to revive' as Watts made inquiries as to the status of the case.

15. Watts filed a supplemental complaint on April 25, 2022 that elaborated upon his allegations against Perdue but still did not question the chicken feed. (Appendix, Ex. 10, Watts Supplemental Whistleblower Compl.). His requested relief included (a) "compensatory damages for lost earnings, compensation, and capital resulting from the loss of his employment with contract [sic] with Perdue"; (b) "general and emotional damages for the emotional and mental distress, anxiety and loss of enjoyment of life that he has suffered as a result of the loss of his employment contract with Perdue, the hostile working conditions, and the damage to his reputation described above"; (c) "compensatory damages for the loss of income and expense incurred caused by the … delayed placements of his flocks by Respondent, and for wages paid to his employee as a result of his employee's mandatory attendance at the training session held on January 8, 2014"; (d) attorney's fees and costs, which are "penalties" under the FSMA assessed at the Secretary's discretion; and (e) "all other relief available at law and equity." *Id.* at ¶¶ 80, 81, 82, 85.

**RESPONSE**: Disputed to the extent Perdue's statement asserts that Watt's supplemental complaint did not address feed and disputed as to the completeness of Perdue's description of Watt's requested relief. In his supplemental complaint, Watts alleged that he "fed, watered, and cared for those flocks using feed, medications, and other supplies provided by [Perdue]," and that Perdue "imports, exports, receives, and stores grains and other raw and processed agricultural commodities and products, which [Perdue] processes for use in animal feed and pet food." Pl.'s Appendix, Ex. 10, Watts Supplemental Whistleblower Compl.¶¶ 8, 14, ECF No. 51-10. Additionally, as to the final sentence, Watts also sought injunctive "expungement of the December 29, 2014 letter placing him under a Performance Improvement Plan." *Id.* ¶ 84.

16. ALJ Kultgen denied Perdue's motion to dismiss on October 21, 2022. (Appendix,

Ex. 11, OALJ Dec. and Order at 10-11).

**RESPONSE**: Undisputed.

17. On March 11, 2024, Perdue applied for document and deposition subpoenas to explore, *inter alia*, the video evidence forming the heart of Watts' claims. (Appendix, Ex. 12, Perdue's Application for Subpoenas). These requests were denied four days later when the ALJ *sua sponte* quashed Perdue's subpoena requests, ruling that OALJ lacks statutory authority to issue subpoenas and FSMA provides no further authority. (Appendix, Ex. 13, Order Quashing Subpoenas (Mar. 15, 2024)). Perdue moved for reconsideration or, in the alternative, for certification for interlocutory appeal to the ARB, arguing that the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims. (Appendix, Ex. 14, Perdue's Mot. to Certify Interlocutory Appeal or for Reconsideration (Mar. 25, 2024)). On April 24, 2024, ALJ Kultgen denied this motion. (Appendix, Ex. 15, Order Denying Mot. to Certify Interlocutory Appeal).

**RESPONSE**: Disputed as to the claim that the "the denial of third-party discovery violated due process given the importance of the issue: basic discovery about the preparation and production of a crucial aspect of Watts' claims," which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts. Also disputed as Defendant Watts had worked with Perdue and third parties on arrangements for cooperative third party discovery from Perdue's requested parties.

18. On July 19, 2024, Perdue apprised the ALJ of *Jarkesy* and Perdue's intent to move to dismiss for lack of subject-matter jurisdiction and to move for leave to amend to assert affirmative defenses based upon *Jarkesy I* and *II*. (Appendix, Ex. 16, Perdue's Letter

Requesting Conference). It asked for a conference call to discuss a briefing schedule and a temporary stay of discovery pending a ruling. *Id*. Watts opposed. (Appendix, Ex. 17, Watts' Resp. to Request for Conference (July 19, 2024)). On July 23, 2024, the ALJ denied the request, ruling that DOL's ALJs "lack the power and authority to decide constitutional questions" and thus she "cannot and will not grant any motion to dismiss on constitutional grounds." (Appendix, Ex. 18, Order Denying Conference Call at 2). The order quoted dicta in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), that adjudication "'of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies,'" *id*., but failed to mention *Thunder Basin*'s next sentence, which states, "[t]his rule is not mandatory, however…." *Id.* Despite denying Perdue's motion before the motion was ever filed, the order allowed Perdue to file its motions to preserve positions for appeal. *Id.* Finally, a footnote suggested that the parties "confer to consider whether voluntary removal to federal court pursuant to 21 U.S.C. § 399d(b)(4)(A) might adequately resolve the constitutional questions raised and avoid protracted litigation on those issues." *Id*. at 2 n.3.

**RESPONSE**: Disputed as to the characterization of the ALJ's order as inconsistent with portions of the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), which implicates a legal conclusion instead of a fact and is therefore inappropriately included in the Statement of Material Facts. Additionally, disputed as to the assertion that the ALJ "den[ied] Perdue's motion before the motion was ever filed." The ALJ issued a written decision denying Perdue's motion to dismiss on August 8, 2024, after the motion to dismiss was filed. Pl.'s Appendix, Ex. 21, Order Denying Mot. to Dismiss, ECF No. 51- 21.

19. Perdue moved to dismiss for lack of subject-matter jurisdiction based upon *Jarkesy I* and *II* on July 29, 2024. (Appendix, Ex. 19, Perdue's Mot. to Dismiss). Watts opposed, arguing only that the OALJ could not consider constitutional challenges, but not addressing whether *Jarkesy I or II* applied. (Appendix, Ex. 20, Watts' Opp. to Mot. to Dismiss (July 30, 2024)). He opposed any voluntary removal to federal court. *Id.* at 3.

**RESPONSE**: Undisputed.

20. On August 8, 2024, ALJ Kultgen denied Perdue's motions to dismiss and leave to amend, again ruling that she lacked authority to decide constitutional questions. (Appendix, Ex. 20, Order Denying Mot. to Dismiss). She did, however, amend the scheduling order to allow this Court an opportunity to consider whether to issue a preliminary injunction. *Id.* at 2-3.

**RESPONSE**: Disputed as to Perdue's characterization of the ALJ's order as "ruling that she lacked authority to decide constitutional questions." The ALJ did not rule that she "lacked authority to decide constitutional questions," only that she "lacked the authority to decide the constitutional question at issue" in Perdue's motion. Pl.'s Appendix, Ex. 21, Order Denying Mot. to Dismiss at 1-2.

Dated: March 12, 2025

                                                             Respectfully Submitted,

                                                             /s/ *Stephani L. Ayers*

                                                             Stephani L. Ayers Washington State Bar #31610
                                                             GOVERNMENT ACCOUNTABILITY PROJECT
                                                             1612 K St., N.W., Suite 808
                                                             Washington, DC 20006
                                                             P: (813) 382-7865
                                                            stephani@whistleblowerdefenders.com

                                                             Attorneys for Defendant Craig Watts

                                                             */s/Gary W. Jackson*
                                                             Gary W. Jackson
                                                             Law Offices of James Scott Farrin
                                                             555 S. Mangum Street, Suite 800

Durham, NC 27701
Phone: (919) 688-4991
gjackson@farrin.com
N.C. Bar No. 13976
Local Civil Rule 83.1(d) Attorney for Defendant