# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### CASE NO. 5:24-cv-00477-BO-RJ

| | |
|---|---|
| **PERDUE FARMS INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **LORI CHAVEZ-DEREMER**, in her official capacity as Secretary of the U.S. Department of Labor, et al., <br><br> Defendants. | **RESPONSE/REPLY MEMORANDUM IN OPPOSITION TO DEFENDANTS' DISPOSITIVE MOTIONS, AND IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

**PLAINTIFF PERDUE FARMS INC.'S RESPONSE/REPLY MEMORANDUM
IN OPPOSITION TO DEFENDANTS' DISPOSITIVE MOTIONS
AND
IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Page(s)*

TABLE OF CONTENTS ...................................................................................................... i

OVERVIEW ...................................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.  This court has subject matter jurisdiction under *Axon Enterprise*. ....................... 2

    A.  FSMA's express review bar applies only to final agency orders, and defendants fail to identify any language in that provision that expressly precludes collateral constitutional claims to the structure of agency proceedings. .............................. 2

    B.  *Axon* compels a holding that FSMA's review scheme does not implicitly prohibit the district courts from Perdue's claims, and Defendants offer no compelling arguments to distinguish that case. ...................................................... 5

II.  Perdue's claims about ongoing constitutional violations are not time-barred by the statute of limitations or the doctrine laches. ................................................... 10

III.  Defendants offer no compelling grounds to bring this case outside the ambit of the Seventh Amendment. ....................................................................................... 13

    A.  Defendants fail to demonstrate that FSMA claims do not resemble 18th Century Breach-of-Contract and Tort Actions. ...................................................... 14

    B.  DOL seeks to curtail the Seventh Amendment's jury-trial right by recharacterizing compensatory damages as equitable relief. ................................ 19

    C.  DOL's invocation of the "public rights" exception overlooks the clear limitations imposed by the Supreme Court in *Jarkesy II*. ..................................... 23

IV.  DOL's Article III Argument Fails for the Same Reason that Its Public-Rights Exception Fails. ..................................................................................................... 25

V.  Defendants misapply the removal power caselaw, which requires no additional showing of harm when a plaintiff challenges their subjection to unconstitutional proceedings. .......................................................................................................... 26

VI.  DOL's nondelegation argument misapprehends the delegation effected by FSMA, which grants claimants the right to determine whether claims may be heard in an Article I tribunal or an Article III court. ........................................................... 30

VII.  DOL fails to illustrate how the FSMA aligns with due process, and ignores the most essential due process violations at issue in this case. ................................ 34

CONCLUSION ................................................................................................................. 37

i

<u>**OVERVIEW**</u>

In recent years, the Supreme Court has reaffirmed that administrative proceedings cannot be structured in a manner that tramples on core constitutional rights. It has held that defendants in agency proceedings are entitled to a jury in an Article III court when the claims against them are legal in nature. *See SEC v. Jarkesy*, 603 U.S. 109 (2024) ("*Jarkesy II*"). It has clarified that those proceedings cannot be run by executive officers who are twice insulated from presidential removal. *See Seila L. LLC v. CFPB*, 591 U.S. 197 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010). And it has held that litigants may bring suit directly in district court to enjoin unconstitutionally structured administrative adjudications—without first waiting for those proceedings to conclude. *See Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023).

These decisions compel a clear result: The whistleblower claim filed by Defendant Craig Watts belongs in an Article III court, not an Article II agency tribunal. The DOL administrative proceedings should be permanently enjoined. And because no material facts are in dispute, this Court can do so right now, and decide this case as a matter of law.

Defendants' motions to dismiss and for summary judgment seek to defy those changes in law, and to circumvent the Supreme Court's clear rulings in those cases. They construe damages that "make the plaintiff whole" as equitable relief—never mind that centuries of common-law jurisprudence confirms this is the purpose of compensatory damages in every tort and contract suit. They insist Perdue must show "compensable harm" arising from a removal-power violation—despite the fact that subjection to unconstitutional agency proceedings is, itself, a harm that cannot be remedied once those proceedings are over. And they insist that FSMA expressly bars collateral constitutional challenges—even though the provision they cite, by its plain language, applies only to "final agency orders."

1

None of these arguments survive scrutiny. Indeed, *Axon* and *Jarkesy II* alone are sufficient to decide this case without addressing Article III, the removal power, the nondelegation doctrine, or due process. Nor are Perdue's claims untimely: Until *Axon* and *Jarkesy II* were decided, Perdue could not responsibly file this action. And, in any event, Perdue's constitutional injuries are continuing, ongoing, and fully actionable.

This Court should grant summary judgment to Perdue and end this dispute. Watts and Howell will have their day in court, regardless of outcome. But if the Constitution's "promise of 'a fair trial before a fair tribunal'" is to mean anything, *Jarkesy II*, 603 U.S. at 141 (Gorsuch, J., concurring) (citation omitted), Perdue must have its day as well.

## ARGUMENT

### I. This court has subject matter jurisdiction under *Axon Enterprise*.

Defendants continue to misstate the plain language of the FSMA, and to elide the Court's holding in *Axon*. To strip federal courts of jurisdiction over a "class of cases," *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007), Congress "may do so explicitly, providing in so many words that district court jurisdiction will yield[,]" or it "may do so implicitly, by specifying a different method to resolve claims about agency action." *Axon*, 598 U.S. at 185. Here, Congress has done neither. Defendants reference FSMA's express review bar, but the language of that section does not apply to claims like Perdue's. And under *Axon*, FSMA's ordinary statutory review scheme does not implicitly strip courts of jurisdiction over these claims, either.

### A. FSMA's express review bar applies only to final agency orders, and defendants fail to identify any language in that provision that expressly precludes collateral constitutional claims to the structure of agency proceedings.

DOL insists that the "plain language" of FSMA "explicitly" strips this Court of subject-matter jurisdiction over Perdue's constitutional claims. DOL Mem. 6. Not so. FSMA's explicit review bar strips district court jurisdiction over "final [DOL] orders." 21 U.S.C. § 399d(b)(5)(A).

2

Case 5:24-cv-00477-FL    Document 58    Filed 04/02/25    Page 4 of 41

It does not apply to collateral constitutional claims like Perdue's, which challenge the structure of DOL proceedings and not the substantive decisions reached in those proceedings, much less a final order issued by the agency. Defendants identify no language in the statute that applies to collateral claims arising from the proceedings, such as structural constitutional claims.

While Defendants rest their jurisdictional claims on the "plain language" of that FSMA, a brisk walk through the statutory language clearly illustrates their arguments fail. DOL Mem. 8. Subparagraph 5 of the review provision states that an aggrieved party may seek review of the Secretary's "final order" directly in the court of appeals within 60 days:

> **(A) General**
>
> Unless the complainant brings an action under paragraph (4), any person adversely ***affected or aggrieved by a final order*** issued under paragraph (3) may obtain review of the order in the United States Court of Appeals for the circuit in which the violation, with respect to which the order was issued, allegedly occurred or the circuit in which the complainant resided on the date of such violation. The petition for review must be filed not later than 60 days after the date of the issuance ***of the final order of the Secretary.***

21 U.S.C. § 399d(b)(5)(A) (emphasis added). That same subparagraph prevents aggrieved parties from seeking judicial review of a "final order" directly in a district court:

> **(B) No judicial review**
>
> An ***order of the Secretary*** with respect to which review could have been obtained under subparagraph (A) shall not be subject to judicial review in any criminal or other civil proceeding.

21 U.S.C. § 399d(b)(5)(B) (emphasis added). The FSMA defines "final order" as an order of the Secretary following the conclusion of a hearing on the merits:

> **(3) Final Order**
>
> **(A) In general**
>
> Not later than 120 days after the date of conclusion of any hearing under paragraph (2), the Secretary shall issue ***a final order providing the relief prescribed by this paragraph or denying the complaint.*** At any time before issuance of a final order, a proceeding under this subsection may be terminated on the basis of a settlement agreement entered into by the Secretary, the complainant, and the person alleged to have committed the violation.

3

21 U.S.C. § 399d(b)(3)(A) (emphasis added). The effect of these provisions is discrete and limited: Together, they create an exclusive pipeline for appealing final DOL orders in whistleblower cases, and preclude review of those orders in the federal district courts. If a party to a whistleblower case wants to challenge DOL's substantive decisions, it must follow those proceedings to conclusion, and seek review of the agency's "final order" in the appropriate court of appeals.

Nothing in that language expressly prohibits review of anything other than "final orders." DOL and Watts never address this aspect of the review provision in their briefing. Because Section 5(B) reaches only final agency orders, it cannot apply here, where no final order has issued. Indeed, Perdue does not challenge any order or substantive decision in the DOL proceedings. Rather, it challenges the constitutionality of the proceedings themselves.

None of Defendants' arguments carry their own weight. Defendants cite a string of unpublished cases to argue that FSMA sweeps far broader than its plain language would suggest. DOL Mem. 8 (citing *Azimov v. DHS*, No. 22-56034, 2024 WL 687442 (9th Cir. Feb. 20, 2024); *CBW Bank v. FDIC*, No. 24-2535-DDC-BGS, 2025 WL 671567 (D. Kan. Mar. 3, 2025); *Moats v. Nat'l Credit Union Admin. Bd.*, No. 3:23-cv-147, 2024 WL 1724271 (S.D. Tex. Apr. 9, 2024)). But these cases involve statutes with broad exclusionary language. In *Azimov*, the relevant statute is sweeping, and provides that "'no court shall have jurisdiction . . . to entertain any other cause or claim ***arising from or relating to***'" the administrative proceedings. *See* 2024 WL 687442, at *1 (quoting 8 U.S.C. § 1252(a)(2)(A)). In *CBW Bank* and *Moats*, the statutes at issue declared that "no court shall have jurisdiction" to hear challenges to "the issuance or enforcement of ***any notice or order***," not merely final agency decisions. *See CBW Bank*, 2025 WL 671567, at *5 (quoting 8 U.S.C. § 1818(i)(1)); *Moats*, 2024 WL 1724271, at *3 (quoting 12 U.S.C. § 1786(k)(1)). Plainly,

4

these statutes nowhere resemble FSMA, which limits review of final orders only—not any orders whatsoever, much less all claims arising from or relating to the agency proceedings.[1]

**B.** ***Axon* compels a holding that FSMA's review scheme does not implicitly prohibit the district courts from Perdue's claims, and Defendants offer no compelling arguments to distinguish that case.**

Defendants also argue, in various ways, that the review scheme implicitly strips jurisdiction over Perdue's claims. *Axon* disposes of their arguments. Even when a statute sets forth an exclusive scheme for judicial review, courts must determine "whether the statutory review scheme, though exclusive where it applies," actually "reaches the claim in question" at all. *See id.* at 186. A statutory review scheme will not implicitly strip district courts of jurisdiction over a given matter if (1) "preclusion could foreclose all meaningful judicial review"; (2) the suit is "wholly collateral to a statute's review provisions"; and (3) the claims are "outside the agency's expertise." *Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994) (cleaned up). And in *Axon*, the Supreme Court applied those factors to hold that an "ordinary statutory review scheme does not preclude a district court from entertaining" challenges "to the structure or very existence" of agency proceedings. 598 U.S. at 180, 189. That ruling controls here.

Because Defendants cannot rely on FSMA's express bar, *Axon* is on all fours and controls. FSMA's statutory review scheme and the nature of Perdue's claims match those presented in *Axon* and require the same outcome: here, as there, the ordinary scheme for review of agency decisions does not implicitly bar extraordinary challenges to its constitutionality. Defendants make scattered arguments in an attempt to distinguish *Axon*. Their arguments fail.

---

[1] Another case string-cited by DOL, *Bohon v. FERC*, 92 F.4th 1121, 1124 (D.C. Cir. 2024), is even further afield. There, plaintiffs tried to sue in district court following a final order and their own initiation of judicial-review proceedings in the appellate court. *Id.* at 1122. The D.C. Circuit merely held that, once appellate jurisdiction existed, district-court review of the same issues was barred and *Axon* had no applicability. *Id.* at 1124

5

***First***, DOL argues that allowing immediate review would conflict with the "purpose" of the FSMA statutory structure. *See* DOL Mem. 8-9 (arguing that limiting the statutory prohibition to its text would work against its "purpose"). But the purpose of a statute cannot override its plain language unless the plain language would create absurdities. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) ("When the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (quoting *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004))); *see also Republic of Hungary v. Simon*, 604 U.S. ___, 145 S. Ct. 480, 497 (2025) ("[P]olicy concerns . . . cannot 'surmount the plain language of the statute.'" (quoting *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 284 (2024))). Here, the language is plain and its implications straightforward. Litigants challenging decisions made in the agency proceedings must follow the prescribed appeal process and seek review of a final order. Litigants arguing that the process itself is unconstitutional, irrespective of outcome, need not do so.

Rather than cite any case to support its statutory-purpose argument, DOL gamely quotes a Scalia-Garner treatise for the proposition that "'a textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.'" *See* DOL Mem. 7 (quoting Antonin Scalia & Byron Garner, Reading Law: The Interpretation of Legal Texts 63-65 (2012)). Sure. But Justice Scalia himself held for the full Court on countless occasions that courts may not rewrite statutes simply because they discern a broader statutory purpose. That is precisely what DOJ argues here: DOJ insists that this Court should glean a broader statutory purpose from FSMA despite the clear language of 21 U.S.C. § 399d(b)(5) expressly limiting the jurisdictional bar to collateral challenges of final agency orders.

***Second***, DOL insists that allowing a constitutional challenge will subvert the FSMA review scheme by allowing litigants to remove a case to federal court between the time that an ALJ or an

6

ARB ruled and the Secretary issued a final order. DOL Mem. 7. This argument makes no sense. There may be an argument that constitutional claims must be brought in the court of appeals once a final order has issued and the FSMA review bar applies. *Cf. Bohon v. FERC*, 92 F.4th 1121, 1123 (D.C. Cir. 2024) (noting "the *Axon* plaintiffs sued *before* there was an agency order to challenge[,]" at a time when "the relevant statutes were *silent* about the district court's jurisdiction," and finding *Axon* inapplicable where "the Bohons sued *after* there was an agency order to challenge"). But that simply isn't the case here. The DOL has not issued a final order in Watts' proceedings, and Perdue does not seek to challenge any such order.[2]

**Fourth**, Defendants insist that *Axon* does not apply because the plaintiffs in *Jarkesy* had to proceed through the SEC's adjudicatory process before raising their constitutional claims. *See* DOL Mem. 8; Watts Mem. 13-15 (each discussing *Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015)). Sure, in 2015, the D.C. Circuit held that parties aggrieved by unconstitutional agency proceedings "must patiently await the denouement of proceedings within the Article II branch." *Jarkesy*, 803 F.3d at 26 (cleaned up). But that decision is no longer good law. It stands at stark odds with *Axon*, issued eight years later, where the Supreme Court openly held that challenges to "the structure or very existence of agency proceedings" need not wait out the administrative adjudicatory process. 598 U.S. at 180, 191. Indeed, the District of D.C. has already recognized precisely as much. *See, e.g.*, *Avila v. NLRB*, No. CV 24-1688 (RC), 2025 WL 859223, at *6 (D.D.C. Mar. 19, 2025) (ruling

---

[2] Nor would allowing Perdue's claims permit every litigant to simply challenge an ALJ's decisions in district court, and shortcut the review process. Under everyday administrative law, litigants must exhaust statutory remedies before challenging interlocutory ruling in court. *See* 5 U.S.C. § 704(c) ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). That remains true today. Perdue does not argue that this court has jurisdiction over an intermediate agency order, subject to exhaustion. Rather, Perdue argues that it should not have to go through the challenged adjudication at all.

7

that *Axon* is "on point and controlling here," not the D.C. Circuit precedent in *Jarkesy*, and finding

"jurisdiction over [plaintiff's] separation-of-powers claim").[3]

**Fifth**, Watts takes a token stab at *Thunder Basin*, but fails to respond to Perdue's analysis, or to distinguish *Axon* in any meaningful way.[4] Watts Mem. 12. He insists that the opportunity to appeal to the Fourth Circuit following the proceedings is enough for "meaningful judicial review"; that Perdue's challenges are not "wholly collateral" because FSMA provides a process for judicial review; and that ARB judges are capable of addressing the constitutionality of their own process. Watts Mem. 12. He is wrong. *Axon* holds that appellate review comes too late to remedy the subjection to an unconstitutional adjudication, 598 U.S. at 192; challenges to an agency's "power to proceed at all, rather than actions taken in the agency proceedings" are "collateral," *id.* at 193; and that such claims raise "'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy,'" *id.* at 194 (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010)); *accord Carr v. Saul*, 593 U.S. 83, 93 (2021) ("[A]gency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise."). Watts' arguments parrot those the Supreme Court rejected in *Axon*, and should carry no serious weight.

---

[3] DOL cites to two recent out-of-jurisdiction cases that did not apply *Axon*'s crystal-clear holding as to jurisdiction. *See* DOL Mem. 8-9 n.2 (citing *Yapp USA Auto. Sys., Inc. v. NLRB*, *Inc. v. NLRB*, 748 F. Supp. 3d 497 (E.D. Mich. Sept. 9, 2024); *Blankenship v. FINRA*, No. CV 24-3003, 2024 WL 4043442, at *2-3 n.3 (E.D. Pa. Sept. 4, 2024)). Other courts disagree. *E.g.*, *Avila v. NLRB*, No. 24-1688 (RC), 2025 WL 859223, at *6 (D.D.C. Mar. 19, 2025) ("Similar to the plaintiff in *Axon*, Avila's 'subjection to an unconstitutionally structured decisionmaking process' produces an injury for which judicial review before a Circuit Court after the case before the NLRB is complete 'would come too late to be meaningful.' (cleaned up)).
[4] Notably, the government does not argue the *Thunder Basin* factors at all. DOL does not address the three-part *Thunder Basin* test anywhere in its argument. Without doing so, it offers no basis on which this Court could meaningfully distinguish the holding in *Axon*.

8

In any event, Watts is judicially estopped from arguing that the ALJ can hear constitutional claims. Under the doctrine of judicial estoppel, when "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 10 (D.C. Cir. 2021) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). Before the ALJ, Watts argued emphatically that the agency lacks authority to decide constitutional claims:

> Neither the Office of Administrative Law Judges (OALJ) nor the Administrative Review Board, nor the Secretary of Labor has jurisdiction to declare a statutory scheme unconstitutional. No one in the DOL has been authorized by Congress to adjudicate the constitutional issues Perdue intends to raise. It is a well-established principle of administrative law that agencies lack the authority to rule on the constitutionality of their own enabling statutes or statutory jurisdiction. See, e.g., *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.")[.]

Colaizzi Decl. Ex. 17, Watts Opp. Mem. 1, ECF No. 6-17. And the ALJ adopted that argument, concluding that she "lack[s] the power and authority to decide constitutional questions." Colaizzi Decl. Ex. 18, ALJ Ruling at 2, ECF No. 6-18. Having successfully argued that ALJs lack power to decide constitutional issues, Watts cannot reverse course merely because a contrary ruling will suit his interests in this case.

If this case did not fit *Axon* like Cinderella's slipper, Defendants would have spent much of their argument distinguishing the two. They do not. The only distinction offered by Defendants is their assertion that FSMA explicitly precludes collateral challenges. But because the FSMA review applies only to "final orders," it is irrelevant here. And because Defendants cannot show that the *Thunder Basin* factors would weigh differently here than in *Axon*, this Court should find that it has subject-matter jurisdiction.

9

## II. Perdue's claims about ongoing constitutional violations are not time-barred by the statute of limitations or the doctrine laches.

DOL and Watts each contend that Perdue's claims are untimely, but on different grounds. DOL argues that Perdue's claims are barred by the six-year federal statute of limitations or, in a brief footnote, the equitable doctrine of laches. DOL Mem. 9-10. Watts argues that Perdue waived the claims by failing to raise them at the outset of the DOL proceedings. Watts Mem. 15-16. These arguments all fail for a very simple reason: Because *Bennett* barred this action until 2023, and *Jarkesy* barred this action until 2024, Perdue's could not possibly have filed suit earlier.

DOL's constitutional violations are ongoing and continuing, so the statute of limitations has not run. Under established law, "the continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations." *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989), *aff'd in part on other grounds sub nom*, *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990). As the Fourth Circuit has noted, "when a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff under certain circumstances may allege a 'continuing violation' for which the statute of limitations runs anew with each violation." *DePaolo v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2021) (quoting *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166-67 (4th Cir. 1991)).

By analogy, Perdue's injuries are ongoing: The ALJ has refused to dismiss this case despite Perdue's constitutional objections, forcing Perdue to take part in illegitimate agency proceedings. And Perdue has squarely alleged that it is injured every day that the DOL proceedings go forward. It must proceed before an ALJ unconstitutionally insulated from accountability, with no subpoena rights, no jury trial, and none of the other procedural protections inherent in an Article III court. Worse, it must win twice: The statutory scheme gives Watts a mulligan, letting him restart the case in district court even if he loses before the agency. And the ALJ's lack of subpoena power under

10

FSMA was a new development in the law that was unknown until shortly before Perdue filed its suit. *Axon* makes clear that these constitutional deficiencies are "here-and-now" injuries. Here-and-now means current-and-ongoing. As Perdue has been and will continue to be injured—an injury that *Axon* squarely recognizes—its claims are not barred by limitations.[5]

Even if it were to apply, the statute of limitations was tolled by the Fourth Circuit's binding precedent in *Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016), until that case was overruled by *Axon*. Equitable tolling applies where (1) the plaintiffs were diligent in pursuing their rights; and (2) extraordinary circumstances justify tolling the statutory deadline. *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 257 (2016). Such "extraordinary circumstances" exist when "the circumstances that cause a litigant's delay are both extraordinary and beyond its control." *Id.* The "beyond its control" element is satisfied by legal futility—such as where binding authority barred the plaintiff's claims during the limitations period. *Cf. Lona v. Barr*, 958 F.3d 1225, 1230-31 (9th Cir. 2020) (holding equitable tolling "claims based on changes in the law are not unheard of, nor are they prohibited" (discussing *Lugo-Resendez v. Lynch*, 831 F.3d 337, 343-45 (5th Cir. 2016))).[6]

---

[5] In some situations, a single unconstitutional act—such as a law that effects a regulatory taking—can trigger a limitations period even if the effects are ongoing. *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1167 (4th Cir.1991). But the injury Perdue complains of is different in degree and kind. Perdue faces an evidentiary hearing without rules of evidence, and an administrative proceeding without rules of procedure. It cannot contest DOL's allegations through discovery and subpoena, it could be forced to defend against the very agency adjudicating its claims, and it will have to win twice to ultimately succeed. Those violations will continue to occur if this Court denies relief. This is consistent with the general rule that subject-matter jurisdiction may be raised at any time. If it could be raised at any time in the DOL proceedings, the same principle should apply for a collateral jurisdictional claim—especially given DOL's refusal even to consider it.

[6] The Supreme Court contemplated this scenario in *Menominee*, distinguishing a situation in which a plaintiff believes its claim would be "futile" from one in which they "actually binding precedent" barred the claim but was "subsequently reversed." 577 U.S. at 258 (emphasis in original). The Fourth Circuit limited futility principles in the context of statutory claims for habeas and collateral review of criminal convictions. *Whiteside v. United States*, 775 F.3d 180 (4th Cir. 2014) (en banc).

Those factors plainly apply here: Until *Axon* and *Jarkesy* were decided, binding precedent made Perdue's claims legally futile, and Perdue filed suit promptly once those barriers were lifted. In *Bennett*, the Fourth Circuit held that structural constitutional challenges *must* be raised through the agency's statutory review process, and that district courts wholly lack jurisdiction over claims like Perdue's. 844 F.3d at 188. That case posed an absolute bar to Perdue's claims until April 14, 2023, when *Axon* overruled its holding directly. *See* 598 U.S. at 189. And when *Axon* was decided, a certiorari petition was pending in *Jarkesy* that sought Supreme Court review of most issues raised in this case. Pet. for Writ of Certiorari, *Jarkesy II*, 2023 WL 2478988 (No. 22-859, Mar. 8, 2023). Two months later, on June 30, 2023, the Supreme Court granted that petition. 143 S. Ct. 2688. A year later, it rendered its decision in *Jarkesy*, opening the door to Perdue's constitutional claims. Because Perdue could not have raised these claims earlier, "extraordinary circumstances" justify equitable tolling. And because Perdue acted promptly when that door opened—moving to dismiss the agency proceedings less than one month later, and filing suit less one month after that, it acted diligently in pursuit of its rights.

In a solitary footnote, DOL asserts an equitable defense of laches. *See* DOL Mem. 10 n.3. "Estoppel by laches generally applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011) (quoting *Brittingham v. Jenkins*, 914 F.2d 447, 456 (4th Cir. 1990)). Laches exists to remedy the "unreasonable, prejudicial delay in commencing suit." *FTC v. Pukke*, 53 F.4th 80, 109 (4th Cir. 2022) (quoting *Petrella v. Metro-Goldwin-Mayer, Inc.*, 572 U.S. 663, 667 (2014)). DOL's own argument shows that laches is inapposite. The agency cites a supposed 8-year delay as evidence

But *Menominee*, which issued after *Whiteside*, makes clear that the principle remains applicable in civil matters.

that Perdue "unreasonably waited" to file suit. But that argument ignores the crucial fact that *Bennett* made this suit impossible until April 2023, that the *Jarkesy* certiorari petition was pending at that time, and that said petition was granted just two months later. Perdue cannot have "slept" on its rights when it would have been impossible to bring suit earlier.[7]

Moreover, the doctrine of laches requires prejudice to the defendant. *See White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990); *Costello v. United States*, 365 U.S. 265, 282 (1961). And because laches is equitable and discretionary, prejudice must be weighed against the reasons for the delay. *United States v. Jones*, 155 F.3d 562 (4th Cir. 1998). DOL briefly claims that "Watts and the agency … spent considerable resources during that period investigating and adjudicating Perdue's compliance with the FSMA." *Id.* But none of those efforts will go to waste. All investigation and discovery conducted before the agency will carry over to federal court if this case is moved there. Thus, once Watts' claims are brought to this Court, they will proceed forward with a completion of discovery and trial. There is no prejudice.[8]

### III. Defendants offer no compelling grounds to bring this case outside the ambit of the Seventh Amendment.

Defendants strain mightily to distinguish this case from *Jarkesy II*, but they cannot do so. Their historical analyses miss crucial facts. They fail to grapple with Watts' request for routine compensatory relief, including emotional-distress damages. Their invocation of the "public rights"

---

[7] Moreover, Perdue had no reason to file suit during this interval. Throughout the initial proceedings, the Department of Labor and its subdivisions routinely dismissed Watts' claims. Having won at every turn, further relief was unnecessary.

[8] Watts briefly invokes waiver, contending Perdue abandoned its constitutional claims by failing to assert them at the outset of the DOL proceedings. Watts Mem. 15-16. Watts does not, and cannot, show that Perdue waived its constitutional rights. *See Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983) ("Of course, a waiver of a constitutional right is effective only if it is 'an intentional relinquishment of a known right or privilege.'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))). Watts' reflexive invocation of waiver fails on its face.

exception ignores *Jarkesy II*'s clear narrowing of that exception to circumstances which do not exist here. And they offer no case holding that everyday emotional distress and economic loss damages are equitable in nature. Given the Court's admonition that "any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care[,]" *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935), the Seventh Amendment should remain inviolate here.

### A. Defendants fail to demonstrate that FSMA claims do not resemble 18th Century Breach-of-Contract and Tort Actions.

The first prong of the Seventh Amendment test asks whether a claim has an eighteenth-century common-law analogue. Defendants hang their hat on the notion that whistleblower claims did not exist in 1791. *See* DOL Mem. 15 (arguing that "wrongful discharge" is "a mid-20th century innovation"); Watts Mem. 16-18 (arguing that whistleblower claims apply a novel proof standard). These arguments miss the point. The Seventh Amendment does not require a claim to have existed in the late 1700s—only that it be "at least analogous" to an eighteenth-century common law claim. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708 (1999); *accord Jarkesy II*, 603 U.S. at 139 ("[T]he Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims."). For all the reasons discussed in Perdue's prior briefs, FSMA whistleblower claims resemble breach of contract and intentional torts that were common in the eighteenth century. Such claims are legal in nature.

***First***, for its part, DOL boldly asserts that "wrongful discharge has no roots in 18th century common law; rather, it is a mid-20th century innovation." DOL Mem. 15. In so arguing, DOL fails to address the many cases Perdue produced holding that wrongful discharge resembles 18th-century claims for a breach of an employment contract.[9] *See, e.g.*, *Lebow v. Am. Trans Air, Inc.*,

---

[9] DOL argues North Carolina common law does not recognize a claim for wrongful discharge, DOL Mem. 15 (citing *Hardin v. Belmont Textile Mach. Co.*, 355 F. App'x 717, 720 (4th Cir. 2009). That is irrelevant. The test is whether the claim is analogous to 18th century English common law,

86 F.3d 661, 668 (7th Cir. 1996); *Waldrop v. S. Co. Servs., Inc.*, 24 F.3d 152, 156 (11th Cir. 1994); *cf. Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254, 266 (5th Cir. 2014). And DOL does little to distinguish the many cases holding that the Seventh Amendment applies in civil rights actions. *E.g.*, *City of Monterey*, 526 U.S. at 709-10 (deprivation of civil rights under 42 U.S.C. § 1983); *Curtis v. Loether*, 415 U.S. 189, 195 (1974) (fair-housing discrimination claims under Title VIII). Its only answer is to contend that these cases "do not shed any additional light on the nature of the whistleblower claims under the FSMA." DOL Mem. 15. That misses the point. Cases such as *Loether* and *Monterey Dunes* demonstrate that statutory claims similar to intentional torts receive Seventh Amendment rights even if they are "innovative."

Lacking any persuasive caselaw, DOL turns instead to scholarly articles. But the articles it leans on are irrelevant. DOL references two law review articles discussing the rise of the at-will employment doctrine in the United States.[10] Neither has any bearing on the Seventh Amendment inquiry, which focuses on "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Tull v. United States*, 481 U.S. 412, 421-23 (1987). Rather, as a leading scholar noted shortly after the adoption of Sarbanes-Oxley, "an improper employment discharge in eighteenth century England would have been viewed as a breach of contract claim." *See* Jarod S. Gonzalez, *Sox, Statutory Interpretation, and the Seventh Amendment: Sarbanes-Oxley Act Whistleblower Claims and Jury Trials*, 9 U. Pa. J. Lab. & Emp. L. 25, 57-58 (2006) (arguing, in leading article, that SOX whistleblower claims fall under the Seventh Amendment).

---

not North Carolina common law—and the claim need only resemble such a common law claim, not have been recognized as valid at that time.

[10] *See* Donald G. Kempf, Jr. & Roger L. Taylor, *Wrongful Discharge: Historical Evolution, Current Developments, and a Proposed Legislative Solution*, 28 San Diego L. Rev. 117, 118 (1991); Joan M. Krauskopf, *Employment Discharge: Survey and Critique of the Modern At Will Rule*, 51 UMKC L. Rev. 189, 1922 (1983).

15

**Second**, Watts goes further, arguing that the structure of FSMA investigations and adjudications is too intricate, too modern, too 20th-century to resemble 18th-century common-law claims. But the Seventh Amendment turns on the nature of the claim—not on its statutory origins, and much less on the complexity of the agency tribunal to which it has been assigned. *See Jarkesy II*, 603 U.S. at 140 ("After *Atlas Roofing*, this Court clarified in *Tull* that the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims."); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989); *Tull v. United States*, 481 U.S. 412, 421 (1987). Watts notes that ALJs receive special training; that OSHA investigates claims; and that DOL adjudications apply various unconventional procedures. Watts Mem. 16-17. But he cites no cases holding that such technical features in the adjudicatory process somehow affect the Seventh Amendment analysis. And those features are common in administrative law. If Watts was correct, Congress could "conjure away the Seventh Amendment" by assigning "traditional legal claims" to "an administrative tribunal." *Granfinanciera*, 492 U.S. at 52.

**Third**, Watts argues that FSMA's use of a "contributing factor" burden-shifting framework brings this claim outside the scope of its common law analogues. Watts Opp. 18 (citing 21 U.S.C. § 399d(2)(C)(iii)). Under that framework, the complainant must allege that their protected activity was "a contributing factor" in an adverse action. 21 U.S.C. § 399d(2)(C)(iii). Upon this showing, the burden then shifts back to the employer to prove that it "would have taken the same unfavorable personnel action in the absence of that behavior." 21 U.S.C. §§ 399d(2)(C)(ii) & (iv).

Watts claims that the contributing factor framework "does not require a covered employee to make any showing of intent or motivation (nor legal causation)," and that "the English common law recognized no such causation-free or intent-free tort action." Watts Opp. 18. Watts is wrong. The "contributing factor" framework applied in whistleblower actions is both a causation and

16

intent framework—it is a burden-shifting scheme, akin to *McDonnell Douglas*, designed to discern whether the employer was motivated, at least in part, by retaliatory intent.

The Supreme Court has reviewed the identical burden-shifting statutory scheme under the Sarbanes-Oxley whistleblower statute (SOX) and held that the "contributing factor" framework is simply a mechanism for establishing intent. *Murray v. UBS Secs. LLC*, 601 U.S. 23, 36 (2024). There, the Court held that while SOX does not impose a freestanding "retaliatory intent" element, "the contributing-factor burden-shifting framework" could determine whether the employer acted with "the intent to take some adverse employment action against the whistleblowing employee 'because of' his protected whistleblowing activity." *Id.* at 35. It reasoned that the framework was akin to *McDonnell Douglas*, as both are "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," and offer "a means of getting at intent." *Id.* at 36 (cleaned up); *see id.* at 35 ("Burden-shifting frameworks have long provided a mechanism for getting at intent in employment discrimination cases.").

Watts is wrong, then, to assert that "[t]he FSMA does not require a covered employee to make any showing of intent or motivation (nor legal causation)." Watts Mem. 18. Though FSMA doesn't impose a "separate, heavier burden on the plaintiff to show retaliatory intent" per se, the contributing-factor framework simply sharpens circumstantial evidence to get at retaliatory intent. *Cf. Murray*, 601 U.S. at 37. Likewise, Watts's claim that the FSMA framework has no causation element is contradicted by the Fourth Circuit case Watts boldly block-quotes (Mem. 18), which proceeds to describe contributing-factor as a "legal causation" standard. *See Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (explaining role of temporal proximity in proving "causation" under contributing-factor analysis).

17

Finally, Watts' argument fails the acid test: Other statutory schemes using burden-shifting requirements that were unknown to 18th century England readily satisfy the Seventh Amendment. *Murray* noted that contributing factor burden-shifting resembles the *McDonnell Douglas* burden-shifting framework used in civil rights cases. 603 U.S. at 35. Many civil-rights statutes subject to the Seventh Amendment, spanning most anti-discrimination contexts, apply *McDonnell Douglas* as a mechanism of proving animus. To name just a few:

- **Fair Housing Act** claims are subject to the Seventh Amendment per *Curtis v. Loether*, though they apply *McDonnell Douglas*. *See Corey v. HUD*, 719 F.3d 322 (4th Cir. 2013); *2922 Sherman Ave. Tenants' Ass'n v. Dist. of Col.*, 444 F.3d 673, 682 (D.C. Cir. 2006) (collecting cases from other circuits applying *McDonnell Douglas*).

- **Age Discrimination in Employment Act** claims are subject to the Seventh Amendment, though they apply *McDonnell Douglas*. *See Pons v. Lorillard*, 549 F.2d 950 (4th Cir. 1977) (Seventh Amendment applies); *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir. 2006); *Burns v.* AAF-*McQuay, Inc.*, 96 F.3d 728 (4th Cir. 1996) (applying *McDonnell Douglas*).

- **Section 1983** claims are subject to the Seventh Amendment per *City of Monterey*, though they apply *McDonnell Douglas. See Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281 (4th Cir. 1985).

- **Section 1981** claims are subject to the Seventh Amendment under *Lytle*, though they apply *McDonnell Douglas* as well. *See Lytle v. Household Mfg, Inc.*, 494 U.S. 545, 550 (1990); *e.g.*, *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244 (4th Cir. 2025).

Each of these statutes falls under the Seventh Amendment because their causes of action resemble claims available in **1793**—even though they employ the *McDonnell Douglas* framework, invented as it was in **1973**. Clearly, then, the use of a novel burden-shifting framework cannot be enough to defeat the Seventh Amendment. Accordingly, Watts' argument that burden-shifting defeats the 18th century analogue test is simply wrong.

**B.  DOL seeks to curtail the Seventh Amendment's jury-trial right by recharacterizing compensatory damages as equitable relief.**

The "more important" part of the Seventh Amendment inquiry is whether the relief sought is legal or equitable in nature.  *Jarkesy II*, 603 U.S. at 123 (cleaned up). Courts everywhere recognize that compensatory damages are everyday common-law legal remedies that have been tried in courts of law for centuries. *See id.* ("[M]oney damages are the prototypical common-law remedy."); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) ("Money damages are, of course, the classic form of legal relief."); *Loether*, 415 U.S. at 196 ("[Damages are] the traditional form of relief offered in the courts of law."); *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("[T]here is overwhelming evidence that the consistent practice at common law was for juries to award damages.").  Claimants seek four types of compensatory damages squarely within the Seventh Amendment's reach: emotional distress and reputational harm, business expenses, economic losses, and lost wages.

Defendants fail entirely to explain how these damages somehow constitute equitable relief. Watts, for his part, does not dispute that Perdue has satisfied this second and more important prong. DOL attempts to do so. Yet rather than offer a single case holding that emotional distress damages, reputational harm damages, non-pecuniary damages, and ordinary economic losses are *equitable*, DOL simply argues that money intended to "make the plaintiff whole" must be equitable in nature. *See* DOL Mem. 12-14.  That cannot be so.

***First***, compensatory damages are always designed to make a plaintiff whole. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) ("It should be presumed a plaintiff has been made whole for his injuries by compensatory damages."); *accord Cavin's Inc. v. Atl. Mut. Ins. Co.*, 220 S.E.2d 403, 406 (N.C. Ct. App. 1975) ("Compensatory damages … are awarded to compensate and make whole the injured party[.]"); *Columbia Fin., Inc. v. Howard*, 327 N.E.2d

654, 658 (Ohio 1975) ("In a tort action, the measure of damages is normally that amount of money which will compensate and make whole the injured party."); *Malco v. Mw. Aluminum Sales*, 109 N.W.2d 516, 521 (Wis. 1961) ("Compensatory damages are given in attempt to make whole the damage or injury suffered by the injured party."). It would be facially absurd to suggest that such damages are equitable. Were it otherwise, everyday common-law tort and contract claims would be equitable in nature. That outcome would eviscerate the Seventh Amendment, depriving parties of their jury-trial rights in bedrock claims that have gone before juries for centuries.[11]

DOL attempts to argue one category of these damages—Watts' claim for economic losses—is "tantamount" to statutory front pay. DOL Mem. 13. That argument misreads the law. Backpay is legal when it is awarded as compensation for the termination of an employment contract, and is only equitable if awarded as "an integral part of an equitable remedy." *Knudson*, 534 U.S. at 214 (quoting *Loether*, 415 U.S. at 197). Front pay, by contrast, is a forward-thinking remedy awarded as a substitute for reinstatement. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). Accordingly, claims for lost wages and economic losses stemming from the defendant's misconduct are legal in nature. *See, e.g.*, *Wooddell v. IBEW*, 502 U.S. 93, 97-98 (1991) (holding that a Labor Management Reporting and Disclosure Act "claim for lost wages cannot be treated as restitutionary incident to an order reinstating him"); *Chauffeurs, Teamsters & Helpers v. Terry*,

---

[11] Historically, the term "make-whole" has been used for equitable financial relief due to equity's historic function as an interstitial cure for harms that courts of law could not address. This interstitial character plainly does not apply here, where the common law has always provided remedies for emotional distress, reputational harm, business losses, lost profits, and lost wages. But even if that definition applied here, "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency[.]" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61 (1989) (requiring jury trial for fraudulent conveyance claims brought in Bankruptcy Court). The Seventh Amendment requires separate analysis to determine whether the remedy is legal or equitable in nature, not a magic label of "making whole," that, in any event, applies to all compensatory damages no matter how characterized.

20

494 U.S. 558, 570, 573 (1990) (holding that the remedy of backpay sought in this duty of fair representation action is legal in nature as it is not money wrongfully held); *accord Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 832 (4th Cir. 1994) (Rehabilitation Act backpay is a legal remedy); *Pons v. Lorrilard*, 549 F.2d 950, 954 (4th Cir. 1977) (ADEA back wages award is a legal remedy). Here, too, Watts' requests for compensatory damages for business losses and emotional distress are retrospective and compensatory. Such relief is legal, not equitable.

**Second,** traditionally legal remedies like emotional-distress damages cannot be considered equitable unless they typically were available in equity courts. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (holding that courts looking to see whether a sought remedy is "equitable" under ERISA may look only to "those categories of relief that were *typically* available in equity"); *Great-W. Life & Ann. Ins. Co. v. Knudson*, 534 U.S. 204, 256 (2002) (same). DOL does not show that Watts' claims for compensation for emotional distress, reputational harm, business losses, and lost business profits were ever awarded in 18th-century courts of equity. And absent that showing, the mere labelling of the claim does not suffice.

**Third,** in arguing that, "when Congress makes monetary relief available under 'a make-whole statute,' the relief is considered equitable," DOL Mem. 13, DOL misapprehends the limited circumstances in which a statutory "make-whole scheme" has been viewed as an equitable remedy. Title VII provides the best example. In Section 706g, Congress established a discretionary set of remedies from which the court may elect, which Congress expressly categorized as equitable. *See* 42 U.S.C. § 2000e-5(g). Backpay under Title VII therefore has been considered equitable because it was on a menu of discretionary relief, an "integral part of the equitable remedy of reinstatement." *Knudson*, 534 U.S. at 218 n.4 (summarizing remedies as "reinstatement with or without backpay"). Similarly, under the National Labor Relations Act (NLRA), the NLRB uses a set of *discretionary*

21

equitable remedies, including backpay, to remedy labor violations. No such discretion exists under FSMA. Indeed, its provision of a jury-trial right if claimants opt-out of DOL proceedings confirms that its remedies are legal and not a vague panoply of elective choices.

This is confirmed by *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1259 (10th Cir. 2004), DOL's principal case for this argument. In considering whether a backpay award under an ERISA provision is legal (and thus unavailable under ERISA) or equitable (and thus available), *Millsap* recognized that Title VII and the NLRA are special schemes where backpay is an elective discretionary option along with other equitable remedies, contrary to the majority of statutory schemes where it is legal:

> Backpay claims, however, do not differ remedially from the personal injury claim for lost wages, or the contract claim for past wages due[.]" 2 Dan B. Dobbs, *Law of Remedies* § 6.10(5) (1993); *see also* 1 George E. Palmer, *Law of Restitution* § 4.1 (1978 & Supp.2003) (describing a claim for breach of personal services contract as sounding in quasi-contract for money damages). A backpay claim is remedially analogous to personal injury or breach of contract claims because backpay awards compensate employees for lost wages and benefits before trial.

*Millsap*, 368 F.3d at 1252-53. Here, too, backpay does not forfeit its predominantly legal character merely because it is used to compensate and make aggrieved employees whole.

**Fourth**, in arguing that only "punitive" fines are legal in nature, DOL misreads *Jarkesy II*. The Court held that SEC civil fines are legal in nature because they aim to "punish or deter" rather than "restore the status quo." *Jarkesy II*, 603 U.S. at 123 (citation omitted). This language refers to restitution and disgorgement, remedies that return "specific property (funds) that the defendant wrongfully possessed and that rightfully belonged to the plaintiff." *Rose v. PSA Airlines*, 80 F.4th 488, 496, 499 (4th Cir. 2023). The Supreme Court has noted the same distinction throughout many Seventh Amendment cases. *Compare City of Monterey*, 526 U.S. at 710-11 ("Compensation is a purpose traditionally associated with legal relief." (cleaned up)), *with Chauffeurs*, 494 U.S. 558,

22

570 ("[W]e have characterized [monetary] damages as equitable where they are restitutionary, such as in actions for disgorgement[.]" (cleaned up)).

*Jarkesy II* did not shift this long-drawn line in the sand. Indeed, it affirmed that "money damages are the prototypical common law remedy," 603 U.S. at 123, a stark contrast with DOL's view that compensation is equitable. In short, the punitive nature of the civil fines in *Jarkesy* made them legal remedies, but nowhere did the Supreme Court take the unprecedented position that *only* fines and punitive damages are legal in nature. DOL's contrary reading would upend centuries of settled practice and eviscerate the Seventh Amendment.

**Fifth**, DOL points to the fact that Watts seeks equitable relief (expungement of a letter placing him under a performance improvement plan) as well as monetary damages and argues that distinguishes his case from *Chauffeurs* and other cases treating backpay as legal. *See* DOL Mem. 14. That is immaterial. When legal and equitable claims are joined in the same action, "the right to jury trial on the legal claim, including all issues common to both claims, remains intact." *Tull*, 481 U.S. at 424; *see generally Beacon Theaters, Inc. v. Westover*, 359 U.S. 500 (1959). Thus, the Seventh Amendment applies as long as at least one of the claimed remedies sounds in law, rather than equity. *See, e.g.*, *Kennedy v. Lakso Co., Inc.*, 414 F.2d 1249, 1252 (3d Cir. 1969); *Tights v. Stanley*, 441 F.2d 336, 338 (4th Cir. 1971). Thus, the presence of some equitable remedies does not vitiate Perdue's right to a jury trial against Watts' legal claims. As the Fourth Circuit said in an analogous situation: "[t]his effort to amputate the [equitable] issues of validity and infringement from the body of the legal action for damages is doomed to failure." *Tights*, 441 F.2d at 337-38.

### C. DOL's invocation of the "public rights" exception overlooks the clear limitations imposed by the Supreme Court in *Jarkesy II*.

Defendants argue in depth that the Seventh Amendment's narrow "public rights" exception takes Watts' claims out of the Seventh Amendment's wide ambit. Little remains of that exception.

This narrow exception does not apply merely because an action "originated in a newly fashioned statutory scheme." *Jarkesy II*, 603 U.S. at 135-39 (cleaned up). Rather, it reaches matters that "historically could have been determined exclusively by the executive and legislative branches." *Id.* at 128. Only two categories of claims fall within this exception following *Jarkesy II*: (1) those that fall within special areas that are categorically subject to the exemption historically, such as immigration, patents, revenue collection, tariffs; and (2) those "closely intertwined" with the statutory regime. 603 U.S. at 128-30, 133-34; *accord Stern v. Marshall*, 564 U.S. 462, 490-91 (2011) ("[W]hat makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action."); *Granfinanciera*, 492 U.S. at 54-55 ("If a statutory right is not closely intertwined with a federal regulatory program … then it must be adjudicated by an Article III court.").

DOL does not argue that FSMA whistleblower claims fall within the first bucket. Nor could it: Clearly, Watts does not bring claims involving immigration, patents, tariffs, or the like. Thus, the only question left is whether FSMA claims are "closely intertwined" with FSMA—that is, whether these claims are inextricable from the statutory scheme. They are not.

**First**, DOL persists in its claims that FSMA is "self-consciously novel." DOL Mem. 17. But that's irrelevant. Nowhere did *Jarkesy II* hold that "self-consciously novel" statutory schemes inherently involve public rights, and fall outside the scope of the Seventh Amendment.[12] In fact,

---

[12] The majority opinion used the term "self-consciously novel" to describe OSHA. The dissent seized upon the term as a way to characterize the majority opinion's explanation of why *Atlas Roofing* reached its decision regarding OSHA. *See id.* at 138. But all Justices agreed in *Jarkesy II* that *Atlas Roofing* either had been significantly narrowed by subsequent decisions (the majority), or effectively overruled (the concurrence and dissent). Either way, *Atlas Roofing* does not apply here. Indeed, to the extent DOL insists *Atlas Roofing* has not been "silently overruled" by *Jarkesy II*, DOL Mem. 18, that argument ignores the consensus of all nine Justices that *Atlas* had been sharply limited, if not vitiated outright.

it held the opposite: that "the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims." *Jarkesy II*, 603 U.S. at 140. And this isn't the first time the Court has said as much. *Granfinanciera*, 492 U.S. at 51; *Tull*, 481 U.S. at 421-23.

**Second**, DOL contends that Section 399d is "so closely integrated into a public regulatory scheme as to be a matter appropriate for agency regulation." DOL Mem. 17-18 (citation omitted). To make support this charge, DOL simply references the history and purpose of the FSMA and its whistleblower provision—explaining that Congress saw the absence of a whistleblower provision as a "deficiency in the law." DOL Mem. 18-19. But that isn't the test. Congress always has reasons to pass new laws and round out gaps in statutory protections.

The proper test is whether the claim at issue is *inextricable* from the regulatory scheme, or whether it can be severed and considered independently by an Article III court. Both *Jarkesy II* and *Granfinanciera* applied this test by examining whether the cause of action at issue "can be brought in standalone suits" in federal court. *Jarkesy II*, 603 U.S. at 134 (quoting *Granfinanciera*, 492 U.S. at 56). Nowhere does DOL consider this test. And for good reason: FSMA *facially* fails. The statute expressly allows claimants to kick their claims out to federal court—away from the administrative agency with alleged expertise in whistleblower claims and the remedial food safety scheme the statute is designed to protect. Perdue Op. Mem. 19. Because Congress itself provided that litigants could assert whistleblower claims as "standalone suits" in federal court, *Jarkesy II*, 603 U.S. at 134 (cleaned up), those claims are not inextricable from the FSMA.

## IV. DOL's Article III Argument Fails for the Same Reason that Its Public-Rights Exception Fails.

DOL contends that *Jarkesy II* held on Seventh Amendment grounds, rather than Article III, but this is a distinction without a difference: the same public- and private-rights analysis applies to both. It then contends that Perdue's claims fail because Watts is seeking to vindicate important

FSMA-protected rights constituting "'integral parts of a public regulatory scheme.'" *Id.* (quoting *Granfinanciera*, 492 U.S. at 55-56 n.10). But DOL ignores the rest of *Granfinanciera*'s footnote, which addresses when Congress may assign legal matters to agencies without a jury-trial right, *i.e.*, the very Seventh Amendment public-rights exception discussed in Section III-C, *supra*. Thus, this statement merely details the "clearly intertwined" standard for the public-rights exception—a test that FSMA plainly fails, as explained above. DOL's argument adds nothing new to justify application of the exception, and should be rejected accordingly.

**V.**      **Defendants misapply the removal power caselaw, which requires no additional showing of harm when a plaintiff challenges their subjection to unconstitutional proceedings.**

The Government has openly conceded that dual-layer removal protections for ALJs are a violation of the Take Care Clause. Indeed, the Solicitor General openly agrees with Perdue that the present scheme is unconstitutional:

> [T]he Department of Justice has concluded that the multiple layers of removal restrictions for administrative law judges (ALJs) in 5 U.S.C. 1202(d) and 752l(a) violate the Constitution, that the Department will no longer defend them in court, and that the Department has taken that position in ongoing litigation.

***

> Consistent with the Supreme Court's decision in Free Enterprise Fund, the Department has determined that those statutory provisions violate Article II by restricting the President's ability to remove principal executive officers, who are in turn restricted in their ability to remove inferior executive officers.

Letter from Acting SG Harris to House Speaker Johnson (Feb. 20, 2025) ("SG Letter"), https://www.justice.gov/oip/media/1390336/dl?inline. As the SG Letter states, the Department of Justice has formally informed *some* courts of this position. *See, e.g.*, Defendants' Notice of Change in Position, *Comcast Corp. v. DOL*, No. 1:24-cv-1401, ECF No. 34 (E.D. Va. Feb. 25, 2025). DOL's concession covers much of Perdue's opening argument.

* * *

26

Watts gamely argues that, notwithstanding the Government's concession that its own DOL ALJs are unconstitutional, those dual-layer removal protections raise no constitutional concerns. Watts Mem. 19-21. The Government is right, and Watts is wrong.

**First**, Watts argues that DOL's ALJs have no policy role, citing out-of-circuit authority. *Id.* at 19. No reply is needed, as this Court already held that DOL ALJs are officers and subject to the prohibition against dual for-cause removal. *K & R Contractors LLC v. Keene*, 86 F.4th 135, 147 (4th Cir. 2023). But even if *Keene* were not controlling, Watts' argument carries no water. Many courts have recognized that ALJs are inferior executive officers, as they are situated within the executive branch and subordinate to agency leadership. *See Lucia v. SEC*, 585 U.S. 237, 247-51 (2018) (holding that SEC's ALJs are inferior officers under Article II's related Appointments Clause); *Jarksey I*, 34 F.4th at 463 (same, applied to removal power under the Take Care Clause); *ABM Indus. Grps., LLC v. DOL*, --- F. Supp. 3d ---, 2024 WL 4642962, at *4 (S.D. Tex. 2024) (applying *Jarkesy I* to DOL ALJs).

**Second**, Watts contends that DOL ALJs evade the prohibition because no federal statute mandates their utilization, and the President could simply create a new system of adjudication if he so chose. *See* Watts Mem. 20. This argument is meritless for the simple reason that the removal power under Article III requires that the President be able to remove individual officers. His ability to impose an entirely different system of adjudicating all claims before the DOL is hardly a remedy if he is dissatisfied with only one in particular.

**Third**, in arguing that both the ARB and the Secretary of Labor can overrules an ALJ's decision, Watts again ignores *Keene*. There, the Fourth Circuit held that, because DOL ALJs' "decisions determining rights and responsibilities under federal law and imposing penalties to enforce the law are not mere recommendations but become final if no party appeals, …. their

27

activities are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power, for which the President is ultimately responsible." *Keene*, 86 F.4th at 147-48 (cleaned up).[13] The mere presence of discretionary review does not vitiate an ALJ's important executive policymaking function any less than review in this Court might do so.

*Fourth*, DOL claims that dual for-cause tenure protection is virtually enforceable absent evidence that the President wanted to remove the ALJ in question, and evidence that the provisions caused harm. DOL Mem. 23. In *Keene*, this Court merely avoided the constitutional question by concluding that the plaintiffs had failed to show any connection between the removal violation and their claimed harm—a challenged agency order. *See* 86 F.4th at 149 (citation omitted). *Keene* and its antecedent authority, *Collins*, view harm as a predicate to challenge a specific agency action. *See Keene*, 86 F.4th at 149; *Collins v. Yellen*, 594 U.S. 220, 257 (2021) (holding that, despite unconstitutional removal restriction, agency decision could not be declared "void ab initio" absent additional showing of harm). But Perdue raises a different injury: its subjection to unconstitutional proceedings. Indeed, their claims are identical to those raised in *Axon*. There, petitioners claimed ALJs enjoyed "two layers of tenure protection" and "could not constitutionally exercise power." 598 U.S. at 182-83. Because proceedings before an unaccountable adjudicator already constitute an immediate, "here-and-now injury," the Court did not demand evidence that the President sought to remove the ALJ. *Id.* at 191. It follows that a here-and-now injury sufficient to establish collateral jurisdiction over a constitutional claim is sufficient to support the claim itself.

---

[13] Even if *Keene* were not controlling authority on the issue, the fact remains that ARB and Secretarial reviews are discretionary, and the ARB reviews ALJ decisions deferentially, applying substantial-evidence and abuse-of-discretion standards. *See, e.g.*, *ABM Indus.*, 2024 WL 4642962, at *5 (explaining that even if review by the Secretary or the ARB occurs, "DOL ALJs still have all the powers to conduct administrative proceedings and therefore to play a major role in shaping the administrative record," and issue determinations that "carry weight").

28

DOL fails to acknowledge the Circuit split on the issue, citing only the cases supporting its decision and neglecting the Fifth Circuit decision (*Jarkesy I*) supporting Perdue. DOL Mem. 23. But the circuits are divided, and DOL's position is wrong on three counts:

- **First:** The cases referenced by DOL apply a rule that evolved before *Axon*, and fail to account for the type of injury *Axon* asserted. *See* DOL Mem. 21 n.6. If *Axon*'s conclusion that this injury "is impossible to remedy once the proceeding is over," 598 U.S. at 191, is sufficient to confer jurisdiction, it should suffice for standing to challenge the unaccountable decisionmaker presiding over one's case.

- **Second:** "[T]he President's removal power is the rule, not the exception." *Seila L.*, 591 U.S. at 228. DOL's position strikes against this principle, and against common sense, by imposing an ad-hoc system of arbiters with no constitutional authority— and permitting challenges only in impossibly narrow situations. Given the broad power ALJs exercise over individual rights and liabilities, that cannot be proper.

- **Third:** the DOL's rule is wrong because it ignores the chasm between prospective relief (barring an ALJ from adjudicating a particular case), and retrospective relief (vacating decisions that have already been made). Vacatur can affect scores of other seemingly resolved matters. There is every reason to believe that *Keene* and *Collins* were daunted by this prospect and intended not to issue opinions with such potentially cataclysmic effects.

The better rule is that informed by *Jarkesy I* and its ilk: The nature of the injury asserted determines the nature of the harm the plaintiff must show. Here, where Perdue's injury stems directly from the unaccountable adjudicator presiding over its case, no greater showing is required. *Cf. Jarkesy I*, 34 F.4th at 463-65.; *Cochran v. SEC*, 20 F.4th 194, 210 n.16 (5th Cir. 2021) (en banc) (declaring that plaintiff "does not seek to 'void' the acts of [the ALJ]. Rather, she seeks an administrative adjudication untainted by separation-of-powers violations.")

***Fifth***, DOL argues that the Court has an alternative option if does not agree with DOL on the merits: sever the dual for-cause removal provisions from the rest of § 399d. DOL Mem. at 23-24. Of course, the Court has another alternative: simply grant Perdue relief based on another claim. In any event, DOL's severance argument fails because, unlike in the cases cited by DOL, a simple and easy remedy already exists in FSMA itself: allowing the case to proceed *as is* in a federal court

29

pursuant to the same statutory scheme at issue. For all of Defendants' purported alarm over that prospect, they have yet to point to any palpable, tangible prejudice that would result from proceeding before an Article III judge instead of an Article II ALJ using a mechanism set forth in the very statutory scheme under review.

**VI.    DOL's nondelegation argument misapprehends the delegation effected by FSMA, which grants claimants the right to determine whether claims may be heard in an Article I tribunal or an Article III court.**

DOL presents Perdue's nondelegation claim as if it were something that it is not. The kickout power accorded Watts is not a mere condition precedent for federal-court litigation, nor does it implement ordinary exhaustion-of-remedy requirements, nor does it confer standard forum-selection rights to the alleged aggrieved party instituting adversary proceedings. It provides FSMA claimants with extraordinary *unilateral* power to wipe out a loss or a proceeding that is in some adversity and headed toward a loss, to declare a mulligan and start over in federal court. It forces their FSMA adversaries to win twice, first before the ALJ and then in district court, before they may prevail. Rather than confront the reality of this extraordinary power gifted to FSMA claimants, DOL tries to paint the issue as something far more innocuous or, even worse, to change the subject entirely. These deflecting efforts are unavailing.

1.      *Perdue has standing*. DOL's argument that Perdue lacks standing because its nondelegation claim is speculative, resting on conjecture about events that have not yet occurred and a future injury that might never occur, DOL Mem. 24-25, is badly misplaced. Perdue's claim is about *Congress'* unconstitutional act by vesting all FSMA claimants with legislative power, not Watts' actual exercise of that power. The wrongful act occurred when Congress enacted FSMA. Perdue was injured by that wrongful act the moment Watts filed his FSMA claim against Perdue and was gifted legislative power to control how his claims would proceed. Perdue must defend

30

against a claim in a proceeding that could prove meaningless should it prevail, and could prove meaningless if it loses, all subject to an unfettered, plenary whim of its adversary.

2.      *DOL's argument about public delegation and separation of powers is a strawman.* Much of DOL's argument shoots down a "public delegation" claim that Perdue does not make. *See* DOL Mem. 25-26.  But Perdue asserts only a "private delegation" claim.  Apparently, DOL believes that since, at the close of its argument, Perdue described the claim as a "separation of powers" violation, the claim magically transformed into a public-delegation claim involving DOL, rather than a private-delegation claim involving Watts.  This takes semantics to a new extreme. Courts use "separation of powers" as a basis for private-delegation claims as well as public-delegation claims, and Perdue's citation following the sentence quoted such a case.  *See Oklahoma v. United States*, 62 F.4th 221, 228-29 (6th Cir. 2023).  ("Precedent confirms that unchecked delegation to private entities at a minimum violate core separation-of-power guarantees"). Whether the principle is loosely characterized by the familiar "separation of powers" or some other name, it is the same principle, as Justice Alito has explained:

> Although no provision of the Constitution expressly forbids the exercise of governmental power by a private entity, our so-called "private nondelegation doctrine" flows logically from the three Vesting Clauses. Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior Congress, the court established by Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private nondelegation doctrine" is merely one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private.

*DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 88 (2015) (Alito, J., concurring).

3.      *The private nondelegation is alive and well and applicable here.* The private and public nondelegation doctrines are similar, and Perdue properly cites public nondelegation cases like *Jarkesy I* for establishing principles to guide analysis.  DOL's insistence that *Jarkesy I* is

31

immaterial, DOL Mem. 26, should be rejected out-of-hand. Similarly, DOL's suggestion that the doctrine is "moribund," citing Justice Marshall's concurring/dissenting opinion over a half-century old, *id.* at 27, is contradicted by any number of 21st century cases like *Oklahoma* and *Pittston* that treat the doctrine as valid and enforceable.

As for the merits, DOL does not account for the extraordinary grant of legislative authority that FSMA conveys to claimants and instead downplays it as merely establishing a "'jurisdictional prerequisite' to bringing a Section 399d retaliation claim to federal court" and does not delegate a governmental authority. DOL Mem. 27 (quoting *Guile v. Durham Nephrology Assocs.*, No. 1:15cv1069, 2016 WL 375077, at *2 (M.D.N.C. Jan. 29, 2016) (cleaned up)); *see also id.* (describing this as a requirement that Watts go to court "following exhaustion of his administrative remedies"). But *Guile* merely uses the term "jurisdictional prerequisite" to explain why dismissal of a federal case was warranted because plaintiff had rushed to federal court without first filing an administrative complaint in DOL. It had nothing to do with the kickout right at issue here. DOL similarly contends that no legislative authority was improperly delegated, as statutes readily give plaintiffs the choice of forum to hear their claims. *See* DOL Mem. 27, 28. The problem here, however, is not the choice of forum; it is, rather, the unilateral power to erase an adverse result and, in effect, to play Article I and Article III proceedings against each other to maximize one party's chance of success and the other party's chance of defeat. DOL never addresses the seminal ruling in *Crowell v. Benson* that assignment of cases to administrative tribunals should be "completely within congressional control," *Crowell v. Benson*, 285 U.S. 22, 50 (1932), which establishes that the power is indeed legislative and thus governmental.

Next, DOL protests that FSMA does not vest "regulatory" authority in claimants to control other private parties. *See* DOL Mem. 28. But that is exactly what occurs here. Watts is given the

32

enormous power to regulate (*i.e.*, control) his litigation over Perdue—if the administrative proceedings are in his favor, he continues; if the proceedings go south, he punts and starts over in federal court. Perdue has no such option. Giving one party a free pass and requiring the other party to win twice in order to prevail at all is the epitome of regulatory power. As Judge Niemeyer has said, "[a]ny delegation of regulatory authority 'to private persons whose interests may be and often are adverse to the interests of others in the same business' is disfavored." *Pittston Co. v United States*, 368 F.3d 385, 394 (4th Cir. 2004) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)).

The impropriety here is worse than providing one competitor exercising regulatory authority over another: FSMA vests an adversary party (Watts) with significant adjudicative rights and authority over his litigation opponent (Perdue), from whom he seeks to recover substantial damages. It lets Watts decide (1) whether Perdue's arbiter is an ALJ or a neutral Article III judge or jury; (2) whether Perdue has access to critical third-party discovery; (3) whether rules of evidence and procedure apply; and (4) whether the tribunal may consider constitutional defenses to its jurisdiction. In plain terms, Watts can decide who adjudicates his claims and which fundamental rights Perdue enjoys—all while granting him two bites at the apple, placing no restraints on their discretion, giving his adversary no say in the matter, and requiring that adversary to win twice in order to prevail. Such power does not belong in the hands of a private litigant. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) ("Such a delegation … is utterly inconsistent with the constitutional prerogatives and duties of Congress."); *Oklahoma*, 62 F.4th at 228-29 (opining that "[i]t is a central tenet of liberty" that Congress "may not empower a private entity to exercise unchecked legislative or executive power").

DOL's heavy reliance on *Currin v. Wallace*, 306 U.S. 1 (1939), *see* DOL Mem. 28, illustrates the principle. *Currin* affirmed a legislative solution for determining how the Agriculture Secretary could allocate resources, limiting activity unless a sufficient proportion of affected tobacco farmers assented. That allowance of public input provided no material advantage to any farmer over another and thus did not implicate the doctrine. *See* 306 U.S. at 6. Here, by contrast, the statutory scheme gives favored private parties unfettered discretion to use an extraordinary litigation advantage over their disfavored adversaries. The fact that Watts does not serve as an adjudicator, *see* DOL Mem. 28, does not mitigate the incredible power that Congress gifted him.

Finally, DOL argues that several other statutes employ the same scheme, and none has been successfully challenged on nondelegation grounds. *See id.* at 27. That, surely, is because no such challenge has previously been raised. Had any court heard and rejected such a challenge DOL would tout the decision loudly. This is an issue of first impression, nothing more.

**VII. DOL fails to illustrate how the FSMA aligns with due process, and ignores the most essential due process violations at issue in this case.**

Finally, the DOL's adjudications do not adhere to the core strictures of due process. At its heart, due process is violated when an administrative agency employs proceedings that are so one-sided as to offend the "deep-rooted demands of fair play enshrined in the Constitution." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1938) (Frankfurter, J., concurring); *accord N.Y. St. Inspection, Sec. & L. Enf't Emps., Dist. Council 82 v. N.Y. St. Pub. Emp. Rels. Bd.*, 629 F. Supp. 33, 48 (N.D.N.Y. 1984) (emphasizing that the practice of giving "unfair advantage" to one party "must be forbidden if the guarantee of due process is to be adequately implemented" (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975))). "Fairness of procedure is 'due process in the primary sense.'" *Anti-Fascist*, 341 U.S. at 161 (quoting *Brinkerhoff-Faris Co. v. Hill*, 281 U.S. 673, 681 (1930)). That standard is not met here.

***First***, DOL argues that no injury has occurred ***yet***. DOL Mem. 29-30. In other words, whatever rank unfairness might lurk in the statutory structure—however slapdash and biased that scheme might be—Perdue cannot have been harmed until Watts reaps the benefits of the lack of subpoena power and the other procedural deficiencies in this case. *Id.* These arguments fail here for the same reasons as before. Giving Watts veto power over the proceedings, which he may exercise at any time, is an ongoing wrong that distorts the overall form of the proceedings. So, too, is any denial to Perdue of subpoena power to investigate the principal allegations against, handicapping Perdue's ability to seek evidence to shape and mount its defense. These harms are real and not inchoate.

***Second***, DOL waves off Perdue's claim regarding its lack of subpoena power as premature, because the ALJ has not yet relied on evidence that Perdue could not investigate. DOL Mem. 29. It also points out that Perdue's lack of subpoena power results from a structural hole in the pertinent statutory schemes and not any individual judgment by the ALJ. *Id.* at 29-30. That latter point illustrates the problem: this is not a challenge to an isolated subpoena denial, but a structural issue in the proceedings that kneecaps Perdue's ability to mount any serious defense. *Axon* demonstrates that such structural inequities *are* actionable. *See* 598 U.S. at 192 ("Axon and Cochran protest the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process."). Litigants challenging the protections they have been afforded should not be left at the whim of the adjudicator, much less their party opponent.

***Third***, the crux of Perdue's due-process claim, of course, is Watts' unfair kickout power. Again, that right is a mulligan, allowing Watts to lose once, try again, and ultimately prevail—all while shackling Perdue with the burden of having to win twice. DOL continues to argue that the

statute does not provide a kickout right after a loss in the agency proceedings. *See* DOL Mem. 25.

DOL is wrong. We invite the Court to review the *full* language:

> If the Secretary has not issued a final decision within 210 days after the filing of the complaint, or **within 90 days after receiving a written determination**, the complainant may bring an action at law or equity for de novo review in the appropriate district court of the United States with jurisdiction . . . .

21 U.S.C. § 399d(4)(A) (emphasis added).  Plainly, the whistleblower may kickout their claims and restart the case not merely if the Secretary has not issued a final decision within 210 days of filing the complaint, but also 90 days after an adverse decision is rendered. That's a mulligan.

DOL contends that "written determination" does not include the Secretary's "final decision within 210 days after the filing of the complaint."  DOL Mem. 25. That hardly would eliminate the unfairness of allowing claimants to negate adverse ALJ and ARB decisions, but it is wrong in any event. An ALJ order is a "written determination."  An ARB ruling is a "written determination." And a post-ALJ, post-ARB "final decision" by the Secretary is a "written determination."   DOL offers no basis for excluding any of these beyond vague *ipse dixit* and DOL's own regulation that does not allow district-court review once the Secretary's final decision issues.  *See* DOL Mem. 25. On its face, this regulation *confirms* that Watts may lose before the ALJ and flee to district court, and that he may lose before the ARB and do the same. And lest there be any doubt, courts faced with identical schemes in other statutes have concluded that claimants may proceed through at least two layers of adjudication before electing to wipe the slate clean "and then start all over again in federal court." *See Gunderson v. BNSF Ry. Corp.*, 29 F. Supp. 3d 1259, 1262 & n.4 (D. Minn. 2014) (citing numerous cases). And those cases allow the kickout but bemoan the waste.  *See id.* (citing, *inter alia*, *Stone v. Instrumentation Lab Co.*, 591 F.3d 239, 248 (4th Cir. 2009)).

DOL offers no substantive defense of this uneven playing field, and no attempt to show how it is fair, balanced, and consonant with due process.  DOL Mem. 30. Basic due process

36

commands "a profound attitude of fairness between man and man, and more particularly between the individual and government." *Anti-Fascist*, 341 U.S. at 162 (Frankfurter, J., concurring). No court has blessed such one-sided justice, and this Court should not do so today.

**CONCLUSION**

The Court should deny all Defendants' pending dispositive motions (ECF Nos. 54, 58), and grant Perdue's motion for summary judgment (ECF No. 48).

Dated: April 2, 2025

Respectfully submitted,

/s/ Roger A. Colaizzi
Roger A. Colaizzi (special appearance)
Kristin M. Koger (special appearance)
Venable LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
202-344-4000
202-344-8300 (fax)
rcolaizzi@venable.com
kmkoger@venable.com

Mitchell Y. Mirviss (special appearance)
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
mymirviss@venable.com

*Counsel for Plaintiff Perdue Farms Inc.*

Margaret Santen
N.C. Bar No. 52927
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
704-405-3119
maggie.santen@ogletree.com

Vanessa N. Garrido
N.C. Bar No. 53470
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8529 Six Forks Road, Suite 600

37

Raleigh, NC 27615
919-789-3194
vanessa.garrido@ogletree.com

*Local Civil Rule 83.1(d) Attorneys for Plaintiff*

38

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2025, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

/s/ Roger A. Colaizzi

Roger A. Colaizzi

39
